## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **ERIN BULL, KATHRYN COLBERT, TAMIKA DAVIS, MISSAES DESJARDINS, EMILY GUGLIEMELLI, TRISTA HUB-BARD, CANDICE JACQUES, REZ'HANA MADDOX, SHERAY OMINYI, CANDACE PEGUES, BRANDI TAPIA, and THE CON-TRIBUTOR, INC., a Tennessee-based non-profit corporation,** | **Civil Action No. _____**<br><br>**Class Action** |
| **Plaintiffs,** | |
| **v.** | |
| **CLARENCE H. CARTER, in his official capacity as Commissioner of the Tennessee Department of Human Services,** | |
| **Defendant.** | |

### COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.     The State of Tennessee persistently and systemically fails to determine eligibility for Supplemental Nutrition Assistance Program (SNAP) benefits reliably or on time, in violation of federal law. The State then compounds those violations by depriving affected households of access to timely hearings and appeal decisions through which they might obtain redress. Tennesseans, like Plaintiffs, are being harmed as a result, including by going hungry, suffering from malnutrition, forgoing payment on bills and medications, having lower credit scores, getting evicted, and filing for bankruptcy. Plaintiffs have filed this action to force the State to process SNAP applications and appeals accurately and on time, hold hearings for lost benefits, and provide adequate notices to participants, as required by federal law.

2.     The Tennessee Department of Human Services (DHS), which Defendant oversees, administers the eligibility and distribution of federal SNAP benefits, also known as food stamps,

in Tennessee. SNAP is the nation's principal defense against hunger and malnutrition. The program serves as a lifeline for individuals with low incomes who struggle to secure their next meal. Federal law requires state agencies to administer SNAP in a manner that ensures that applicants and enrollees receive accurate determinations of their eligibility promptly and within established deadlines. Federal law also directs the State to comply with notice and fair hearing requirements that have been integral safeguards of constitutional Due Process for over half a century. When the state agency fails to comply, as DHS chronically does here, individuals are harmed and must either go hungry, skip meals, or find other ways to secure food—such as turning to any friends or family, locating a food bank, or forgoing payment of other essential bills to pay for it.

3. And these systemic failures by DHS harm organizations that serve individuals experiencing poverty—forcing non-profits like The Contributor and others to divert paid staff, significant time, and resources to help navigate the SNAP system on behalf of the people they serve, among other harms. Plaintiffs seek redress of Defendant's violations of Due Process and the SNAP Act (and its implementing regulations) pursuant to 42 U.S.C. § 1983 as set forth below.

4. Plaintiffs bring this action on behalf of themselves, and classes of similarly situated low-income Tennesseans identified below, seeking declaratory relief, preliminary and permanent injunctive relief, and other relief as set forth herein. Plaintiff Contributor brings this action on behalf of itself as an organization. It seeks the same forms of relief.

## JURISDICTION AND VENUE

5. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, which provides for jurisdiction over all civil suits involving questions of federal law, including actions under 42 U.S.C. § 1983 to redress the deprivation under color of state law of any rights, privileges, or immunities guaranteed by the United States Constitution and Acts of Congress.

2

6.    Plaintiffs seek declaratory, injunctive, and other appropriate relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983 as well as reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

7.    Venue in the Middle District of Tennessee is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District. Defendant performs the official duties of his office at DHS's principal offices, located at 505 Deaderick Street, Nashville, TN 37243, which is located within the District.

**PARTIES**

8.    Erin Bull is an adult resident of Bradley County, Tennessee.

9.    Kathryn Colbert is an adult resident of Knox County, Tennessee.

10.    Tamika Davis is an adult resident of Davidson County, Tennessee.

11.    Missaes Desjardins is an adult resident of Davidson County, Tennessee.

12.    Emily Gugliemelli is an adult resident of Bradley County, Tennessee.

13.    Trista Hubbard is an adult resident of Knox County, Tennessee.

14.    Candice Jacques is an adult resident of Davidson County, Tennessee.

15.    Rez'hana Maddox is an adult resident of Davidson County, Tennessee.

16.    Sheray Ominyi is an adult resident of Davidson County, Tennessee.

17.    Candace Pegues is an adult resident of Shelby County, Tennessee.

18.    Brandi Tapia is an adult resident of Davidson County, Tennessee.

19.    The Contributor, Inc. is a Tennessee-based non-profit corporation that serves individuals experiencing poverty, including food insecurity.  It was formed in 2007 and has its principal place of business located at 154 Representative John Lewis Way North, Nashville, TN 37219.

3

20.    Defendant Clarence H. Carter is sued in his official capacity as Commissioner of the Tennessee Department of Human Services. DHS is the state agency responsible for administering SNAP in Tennessee. *See* Tenn. Code Ann. § 71-5-304. Defendant Carter oversees DHS and its administration of the SNAP program.

## STATUTORY AND REGULATORY SCHEME

21.    Congress established the federally funded, state-administered food stamp program to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. Congress enacted the program to "permit low-income households to obtain a more nutritious diet . . . by increasing food purchasing power for all eligible households who apply for participation." *Id.*

22.    In 2008, the program was renamed the Supplemental Nutrition Assistance Program (SNAP, or the Program) pursuant to the Food and Nutrition Act of 2008, Pub. L. No. 110-246, § 4001-02, 122 Stat. 1651, 1853-60 ("the SNAP Act."). The Program continues to provide benefits to low-income individuals to help them purchase food.

23.    The Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA) is the agency that administers SNAP at the federal level. Congress has expressly delegated to the Secretary of Agriculture, who oversees FNS, responsibility for issuing and enforcing regulations that implement the Act. 7 U.S.C. § 2013(c). States that elect to participate in the Program determine eligibility for the Program and distribute benefits to eligible participants. States receive 100% of funding for SNAP benefits and 50% of administrative costs from the federal government. 7 U.S.C. § 2013. Participating states must administer their programs in accordance with federal statutory and regulatory requirements. *See* 7 U.S.C. § 2020(e), (g); *see* 7 C.F.R. § 273.2.

4

24.     Each state must designate a state agency responsible for administering SNAP and complying with federal statutory and regulatory requirements. 7 U.S.C. § 2012(s)(1), 2020(a), (c), and (d); 7 C.F.R. § 271.4. DHS is designated by state law as Tennessee's state agency for the administration of SNAP. Tenn. Code Ann. § 71-5-304.

25.     Federal law concerning SNAP timeliness requirements "requires *full* compliance absent what is hoped will be minimum human error." *Robertson v. Jackson*, 766 F. Supp. 470, 476 (E.D. Va. 1991), *aff'd*, 972 F.2d 529 (4th Cir. 1992) (emphasis added) (applications); *see Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991) (administrative appeal written decisions); *see also Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (noting statutory text "literally requires strict compliance with its provisions"); *Garnett v. Zeilinger*, 313 F.Supp.3d 147, 155 (D.D.C. 2018) (referring to the "[r]equirement for absolute compliance with the timelines for processing " as 'flow[ing] from the statutory text itself'"). And "[t]here is no exception in the [A]ct or its legislative history … for bureaucratic difficulties or administrative backlog." (citations omitted); concur *Hess v. Hughes*, 500 F. Supp. 1054, 1059 (D. Md. 1980) (referring to original 1964 Food Stamp Act enactment and 1977 amendments, which 2008 amendments did not change).

### *Administration of SNAP in Tennessee*

26.     DHS administers SNAP in Tennessee pursuant to an agreement with FNS. The agreement requires DHS to comply with all applicable federal laws, regulations and guidance, subject to DHS's limited ability to elect certain policy options and obtain waivers from FNS of certain federal requirements.

27.     DHS operates local offices in all 95 of Tennessee's counties. DHS also operates a statewide customer service call center known as OneDHS. OneDHS is also the name of the agency's online portal that provides customer access to select information and documents about

their SNAP eligibility if an applicant or enrollee has access to the Internet and has set up an account. If a SNAP application is linked to a person's OneDHS account, the account is supposed to provide information about any prior applications the person submitted and provide a brief description as to the application's status as well as electronic copies of eligibility appeals or verifications the person submitted, and some eligibility notices, such as requests for verification and notices of decision.

28.     Individuals can apply for SNAP online through the OneDHS portal. They may also submit a printed application by uploading or mailing a printed application to DHS, or by delivering it in person to their local county office. If DHS requires additional documents to verify eligibility, individuals may submit those documents by the same means.

29.     DHS staff are responsible for scheduling and conducting interviews of all SNAP applicants. Almost all such interviews are conducted by telephone.

### Timely Processing Requirements for Initial Applications

30.     As the state agency responsible for administering SNAP, DHS must process applications for benefits within federally mandated timelines. 7 U.S.C. § 2020(a)(1), (e)(3), (e)(4), and (9).  Generally, the application process includes filing and completing an application form, being interviewed, and having certain information verified. 7 C.F.R. § 273.2(a)(2).

31.     Eligibility is determined by "household," which is defined as "(A) an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others; or (B) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption." 7 U.S.C. § 2012(m)(1). Households are typically family units.

32.     For most households, DHS must process applications and provide ongoing SNAP benefits to eligible applicants no later than 30 days after the date of the application, 7 U.S.C. § 2020(e)(3), 7 C.F.R. §§ 273.2(a), (g)(1), 7 C.F.R. § 274.2(b), with the agency's deadline for delivery of benefits being calculated from the date an application is received by the Department. 7 C.F.R. § 273.2(c)(1)(iv). If the hard copy or online application is received outside normal business hours, DHS will consider the application received the next business day. *Id*. For telephonic applications, the application is received the date the applicant provides verbal assent. *Id.*

33.     DHS is required to schedule interviews "as promptly as possible to insure eligible households receive an opportunity to participate within 30 days after the application is filed" and is required to accommodate the needs of groups with special circumstances to the extent practicable. 7 C.F.R. § 273.2(e)(3). DHS is required to verify certain information from households and to give households at least 10 days to provide a requested verification. 7 C.F.R. § 273.2(f).

34.     DHS is prohibited from denying eligibility to an applicant for refusal to cooperate without a finding that a missed interview was the result of the applicant's refusal rather than the mere failure to cooperate. 7 C.F.R. § 273.2(d)(1). A missed interview is not enough to constitute refusal to cooperate and "[i]f there is any question as to whether the household has merely failed to cooperate, as opposed to refused to cooperate, the household *shall* not be denied, and the agency *shall* provide assistance[.]" *Id*. (emphasis added).

35.     Certain households qualify for expedited processing, including those with very low income and liquid resources, those whose housing costs exceed the sum of their income and liquid resources, and certain migrant and seasonal-worker households. 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2(i). DHS must affirmatively identify households eligible for expedited service, 7 U.S.C. § 2020(e)(9), at the time of application. 7 C.F.R. § 273.2(i)(2).

7

36.     DHS is required to use special procedures for expediting certification and issuance of expedited applications. 7 C.F.R. § 273.2(i)(4).

37.     The amount of SNAP benefits for which a household is eligible is determined by household size and by the household's income, as adjusted for certain deductions and exclusions. 7 C.F.R. § 273.9. Benefits are distributed monthly, and when a household is eligible for only part of a month, that month's benefits are prorated according to the number of days of eligibility. 7 C.F.R. § 273.10.

38.     When DHS determines that a household is eligible, it must certify their eligibility for a minimum of six months and, for most households, no more than twelve months 7 U.S.C. §§ 2012(f) and 273.10(f). For households consisting of individuals who are over age 60 or who have a disability, the certification period is two years, subject to the agency's obligation to contact the household at least once in twelve months. 7 U.S.C. § 273.10(f)(1).

39.     SNAP benefits are distributed electronically each month to eligible households. Upon a determination of eligibility, DHS arranges for its contractor to issue the household an electronic benefits transfer (EBT) card, similar to a debit card. Each month, DHS "loads" the new monthly benefit onto the EBT card electronically. In order for household members to access their SNAP benefits, they must have an activated EBT card and a personal identification number (PIN). At the point of sale, the EBT card functions like a debit card. 7 C.F.R. §§ 274.2 and 274.3. Enrollees can use the EBT card to purchase food at authorized grocers and retailers. *Id.*

40.     Federal law requires that an eligible applicant must have "an opportunity to participate" in the Program, meaning that the agency must provide households with an active EBT card and PIN along with benefits available for spending. *See* 7 C.F.R. § 274.2(b). And for normal

applications a household "*has not* been provided an opportunity to participate within the 30-day standard if the EBT card or PIN is mailed on the 29th or 30th day." *Id.* (emphasis added).

41.    If DHS does not determine a household's eligibility and provide an opportunity to participate within 30 days following the date the application is filed, DHS must determine whether the agency itself or the household was at fault using set criteria. 7 C.F.R. § 273.2(h)(1). Before a household can be found at fault for a delay, DHS must have, among other things, offered or attempted to offer assistance in completing the application, given the household at least 10 days from the agency's original request for a verification to provide it, and scheduled a second interview if the first one was missed. Otherwise, fault for delay is attributed to DHS, not the household. 7 C.F.R. § 273.2(h)(1).

42.    For households entitled to expedited service who are eligible for SNAP, DHS must provide SNAP benefits no later than the seventh day following the date an application is filed, rather than within the normal 30-day period. *See* 7 U.S.C. § 2020(e)(9); 7 C.F.R. § 273.2 (i)(1) and (4). The applicant's identity must be verified, but the issuance of SNAP benefits within the required seven days cannot be delayed solely due to a lack of verification of other eligibility factors, including household residency, income, or liquid resources. 7 C.F.R. § 273.2(i)(4)(i).

43.    DHS has set its own policy for processing timelines that take into account time for mail delivery, for purposes of meeting the agency's obligations under federal law. Policy 24.03, *Supplemental Nutrition Assistance Program (SNAP) Timeliness Standards*, TENN. DEP'T OF HUMAN SERVS. (Feb. 1, 2022). In Tennessee, providing an opportunity to participate on time requires mailing a loaded EBT card by the 27th calendar day following the application or 4th calendar day for expedited processing. *Id.*

*Recertification Application Processing and Timeliness*

44. To continue to receive SNAP benefits, recipients must complete a recertification application. *See* 7 U.S.C. § 2020(e)(4).

45. The default length of certification period in Tennessee is six months, meaning that most households go through recertification twice per year. And while individuals who are disabled or elderly have a longer certification time (up to two years), they must still go through DHS's eligibility determination process again as long as they participate in the Program. Recurring delays in the recertification process put enrollees at risk once again—especially for those certified at six month intervals.

46. Prior to the end of a household's certification period, DHS must provide a Notice of Expiration (NOE), which contains, among other things, the date the certification period expires and the date by which the household must submit an application for recertification in order to receive uninterrupted benefits. *See* 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14(b)(1).

47. DHS must send the NOE prior to the start of the last month of the certification period. 7 U.S.C. § 2020(e)(4); *see also* 7 C.F.R. §§ 273.10(g)(2) and 273.14(b)(1)(i) (laying out additional parameters on timing). If an eligible household submits its application no later than 15 days prior to the end of its existing certification period, DHS must provide the first allotment under the new certification no later than one month after the household received its last allotment under the prior certification. *See* 7 U.S.C. § 2020(e)(4); 7 C.F.R. § 273.14(d).

48. Recertifications can be delayed or not completed on time due to the fault of DHS or a household member. As with initial applications, DHS is required to determine whether the delay is the fault of DHS or the enrollee. *See* 7 C.F.R. 273.14(e). If a recertification is delayed or not completed on time, even if it is DHS's fault, the household loses their benefits according to

10

USDA and DHS policy. 7 C.F.R. § 273.14(a). ("No household may participate beyond the expira-

tion of the certification period assigned in accordance with § 273.10(f).").

### Appeal Timeliness

49.     DHS is required to provide "*a fair hearing and a prompt determination thereafter*

to any household aggrieved by any action of the State agency," which affects the participation of

the household in the Program. 7 U.S.C. § 2020(e)(10) (italics added); 7 C.F.R. § 273.15. DHS

must hold a fair hearing and issue a written decision within 60 days of a request for a hearing. 7

C.F.R. § 273.15(c)(1). *See* 7 U.S.C. § 2020(e)(10). If a household requests a postponement, which

can be up to 30 days, DHS's deadline to provide a written decision extends by the length of the

postponement. *Id.*

50.     The statute, 7 U.S.C. § 2020(e)(10), and its implementing regulations embody due

process protections grounded in the Constitution. *See Davis v. Mansfield Housing Authority,* 751

F.2d 180, 187 (6th Cir. 1984), citing *Goldberg v. Kelly,* 397 U.S. 254, 261-64, 25 L. Ed. 2d 287,

90 S. Ct. 1011 (1970).

51.     If an appeal results in an increase in benefits, DHS is obligated to post that increase

to an EBT card within 10 days of receipt of the written decision. 7 U.S.C. § 2020(e)(10).

52.     Households whose benefits have not expired have the ability to request continua-

tion of benefits during the pendency of an appeal. 7 C.F.R. § 273.15(k).  If the appellant requests

continuation of benefits and loses the appeal, DHS makes a claim against the appellant for any

overissuance. 7 C.F.R. § 273.15(k).

### Restoration of Benefits Timeliness

53.     Individuals who lose SNAP benefits may request restoration of benefits after 90

days from the date of agency action. Under 7 C.F.R. § 273.15(j)(1)(i), DHS is required to consider

11

untimely requests for hearings as requests for restoration of lost benefits in accordance with §
273.17. 7 C.F.R. § 273.15(g), generally sets the time period for requesting a hearing of the agency
at 90 days, but expressly says "[a]ction by the State agency shall include a denial of a request for
restoration of benefits lost more than 90 days but less than a year prior to the request."

54.    Individuals can request correction of the underissuance under 7 C.F.R. § 273.17(a)
and then, when that request is denied (or ignored), request a hearing on the denial (or failure to act
with reasonable timeliness).

*Notice Requirements*

55.    DHS SNAP notices are subject to certain federal requirements. The agency is re-
quired to mail a notice of adverse action at least 10 days before an adverse action is taken. 7 C.F.R.
§ 273.13(a)(1).

56.    DHS is required to "explain[] in easily understandable language: the proposed ac-
tion; the reason for the proposed action; and the household's right to request a fair hearing…" 7
C.F.R. § 273.13(a)(2).

57.    Further, consistent with *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306,
314 (1950) and its progeny, households facing the reduction or termination of SNAP benefits must
be provided with sufficient information to know whether to "acquiesce or contest" the agency's
action, as an essential element of the constitutional right to Due Process.

58.    In addition, DHS is required at the initial certification and recertification to provide
the household with a written and oral explanation of how simplified reporting works, a written and
oral explanation of the reporting requirements including the additional changes that must be ad-
dressed in the periodic report and verified, the date the report is due, how to obtain assistance in

12

the filing of the periodic report, and the consequences of failing to file a report. 7 C.F.R. §
273.12(a)(5)(ii).

## ORGANIZATIONAL PLAINTIFF'S FACTUAL ALLEGATIONS

### *The Contributor*

59.     The Contributor is a non-profit social enterprise whose mission is to empower
Nashvillians experiencing poverty to achieve income, dignity, housing, and community. The Con-
tributor partly fulfills that mission by publishing a newspaper of the same name. The organization
sells the newspaper to unhoused people who work for themselves as vendors of the newspaper.
The publication features writing by respected local journalists and by the vendors themselves—
providing an important voice and perspective for the community. Vendors learn how to sell the
papers to the public, keep the money they earn, and then buy more newspapers from The Contrib-
utor as needed to replace their stock.

60.     The Contributor's vendors are all currently or recently unhoused. Many have no
phones or Internet access, have limited literacy or knowledge of computers, and have no fixed
address. Many have serious physical or mental disabilities, and almost all have experienced serious
trauma.  One of the ways that the Contributor helps these vendors find and maintain housing is to
help provide and maintain access to other social services. These services help vendors regain and
maintain financial stability, rejoin their community, and achieve a better quality of life. Through
its work, The Contributor has seen that those who have access to SNAP specifically are more likely
to have positive outcomes and regain and maintain financial stability.

61.      In addition to donations and philanthropic grants, revenues from the sale of news-
papers to its vendors, and the vendors' sale of the newspaper to the public, are vital to The Con-
tributor's economic sustainability, and to its ability to fulfill its mission. Barriers, including SNAP

13

application and appeals delays, affecting the vendors' ability to sell The Contributor's newspapers, therefore adversely affects The Contributor, both in terms of its economic sustainability and the fulfillment of its missions.

62.     Stable housing and stable access to food are closely linked. Without stable access to SNAP or other nutrition benefits, limited funds that would be spent securing housing or other basic necessities must go to pay for food. Disruption of vendor's means of obtaining adequate nutrition, including SNAP, is destabilizing and reduces the likelihood of remaining housed.  As one of the ways its vendors obtain and maintain stable housing, The Contributor helps ensure that its vendors have stable access to SNAP and other nutrition assistance.

63.     Due to Defendant's violations of law complained of herein, the SNAP eligibility and appeals process as it is administered by DHS is almost impossible for most of The Contributor's vendors to successfully navigate without help. The Contributor therefore finds it necessary to devote significant resources to helping vendors overcome DHS barriers to SNAP participation and full access, in order to prevent the improper denial or loss of SNAP benefits from interfering with the vendors' ability to sell newspapers and achieve and maintain stable housing.

64.     Specifically, the violations complained of herein have required The Contributor since February 2022 to fund half of one full-time paid staff position, with the title of SNAP Coordinator, as well as that person's related phone, computer, occupancy and other overhead expenses. The Contributor has found it necessary to maintain that position in order to mitigate the harm to its vendors and its own business revenues that results from Defendant's unlawful administration of Tennessee's SNAP program.

65.     The Contributor's SNAP Coordinator has around 80 active SNAP cases involving the Organization's vendors at any one time. These cases require significant coordination and

organization. The SNAP Coordinator acts as the vendors' surrogate at every step of the SNAP eligibility and appeals process, affording the SNAP Coordinator an intimate, firsthand knowledge of DHS's handling of hundreds of vendors' SNAP cases.

66.     Among other things, the Contributor's SNAP Coordinator personally submits vendor applications to DHS, shepherds documents to DHS verifying eligibility, serves as authorized representative to conduct SNAP eligibility interviews on vendors' behalf, receives all mail and e-mail correspondence from DHS regarding vendor SNAP cases, and, where necessary to contest a wrongful denial or termination, files and pursues appeals, representing vendors at fair hearings.

67.     Were it not for the barriers to SNAP participation resulting from DHS's administration of the SNAP program, complained of herein, The Contributor would be able to commit more resources to enabling more unhoused Nashvillians to obtain and maintain stable housing. By requiring the diversion of The Contributor's resources to mitigate the harm to its vendors caused by his unlawful administration of the SNAP program, Defendant has harmed, and continues to harm, The Contributor by diminishing its ability to fulfill its missions.

68.     In spite of its diversion of organization resources to help vendors overcome DHS's unlawful barriers to SNAP participation, The Contributor cannot completely protect its vendors from the adverse effects of Defendant's unlawful administration of the SNAP program. DHS's delays in affording them an opportunity to participate, its improper denials as a result of the failure to conduct timely interviews or reliably process eligibility documents, the agency's use of vague or misleading notices that engender confusion and anxiety, and the lengthy delays in obtaining redress through the appeal process all have the effect of taking vendors' time and efforts away from selling The Contributor's newspapers and increasing the amount of time, money, and resources necessary for The Contributor to try to address those problems on behalf of vendors. That

results in vendors purchasing fewer newspapers from The Contributor for resale, thereby reducing the organization's revenues, and preventing The Contributor from being able to commit more of its limited internal resources to other measures to combat homelessness. By thus causing a reduction in The Contributor's revenues and diversion of resources, Defendant has caused and continues to cause financial harm to The Contributor, ultimately undermining its ability to fulfill its missions.

## INDIVIDUAL PLAINTIFFS' FACTUAL ALLEGATIONS

### *Erin Bull and Household*

69. Erin Bull is a 45-year-old resident of Bradley County, Tennessee. She lives in Cleveland with her husband and four minor children. For SNAP purposes, Ms. Bull is a household of six. Ms. Bull and her family have had SNAP benefits off and on for a few years.

70. On August 28, 2024, Ms. Bull submitted a SNAP application online on behalf of her six-person household. As part of her August 28, 2024 application, Ms. Bull submitted a bank statement from the joint checking account she shares with her husband at Old National Bank.

71. After September 5, Ms. Bull received a letter asking for proof of liquid resources. Ms. Bull was not sure what "liquid resources" meant as that was different wording than she had heard in previous years and was not one of the forms of proof needed that was listed. The letter stated that she had until September 16, 2024 to provide the requested information.

72. Ms. Bull went to the Bradley County DHS Office before September 16, 2024 to ask. She spoke to a DHS worker who indicated that it meant bank statement. Ms. Bull told the DHS worker that she had already submitted the bank statement information with her original application on August 28, 2024. Ms. Bull accessed her OneDHS portal through her phone and showed the DHS worker. The DHS worker found the submission in her system and told Ms. Bull that there were several documents that had been submitted that the DHS worker had not even

opened yet. The DHS worker stated that she was sending a note for the other DHS worker to re-look at Ms. Bull's application and to continue processing it.

73.     When Ms. Bull heard nothing, she went back to the Bradley County DHS Office and asked about the status of her application. The DHS worker that visit told Ms. Bull that she saw all of the verifications in her portal and that there was nothing else she needed to do but sit and wait as they had up to 30 days to process the application.

74.     Ms. Bull continued to wait and did not see any notices on the website or receive anything in the mail.

75.     Hearing nothing, Ms. Bull stopped in again at the Bradley County DHS office on October 4, 2024. The DHS worker behind the glass was confused and had to ask someone else to help her locate notes on Ms. Bull's SNAP case. The DHS worker eventually came back and told Ms. Bull that she had been denied on September 18, 2024.

76.     DHS claimed to have sent a Notice of Decision to Ms. Bull on September 18, 2024 indicating that her August 28, 2024 SNAP application had been denied on the basis that "A mandatory member refused or failed to verify required information for Liquid Resources."

77.     But Ms. Bull had submitted the proof of liquid resources with her original application. At no point before September 18, 2024, did a DHS worker contact her to alert her that according to DHS she still needed to provide her bank statement or offer to help her obtain a bank statement.

78.     On November 7, 2024, Ms. Bull submitted an appeal for her denied application. As part of her appeal, she requested continuation of benefits.

79.     Ms. Bull did not receive a written decision on her appeal within 60 days.

80.     As of the filing of this lawsuit, no hearing has been set on her appeal.

81.    By December 7, 2024, DHS sent Ms. Bull a Notice indicating that she and her household had been approved for SNAP for $394 per month in benefits. Ms. Bull later contacted DHS and spoke to a worker who indicated that she had been approved for October, November, and December SNAP benefits for $394 per month. The worker indicated that no benefits were provided for August and September 2024 because Ms. Bull's household was purportedly over-income during this period. The DHS worker indicated that Ms. Bull's household income was $4,511 for September, but Ms. Bull disputed this amount and does not know how DHS calculated it.

82.    As of the filing of this lawsuit, Ms. Bull has not received back benefits for August or September.

83.    As a household of six, Ms. Bull and her household must make every dollar with SNAP count to provide food for her family. Missing almost $400 in benefits resulted in the Bulls having to forgo meals, buy less food, and forgo payments on other bills.

84.    DHS will request verifications from Ms. Bull in the future. Given the repeated issues that DHS has in being unable to locate a verification that have been provided, Ms. Bull is likely to have to submit SNAP appeals in the future on this or another basis.

85.     Ms. Bull and her household will have to go through DHS's SNAP application process again in the future.

*Kathryn Colbert and Household*

86.    Ms. Kathryn Colbert, age 40, lives in Knoxville, Tennessee with her three sons. Ms. Colbert is head of her household.

87.     On May 22, 2024, Ms. Colbert and her children applied for SNAP benefits and another public benefits program known as Families First, Tennessee's Temporary Assistance for Needy Families program, which is also administered by DHS.

88.     Ms. Colbert's household was denied for SNAP on June 10, 2024 on the purported basis that "Your income exceeds the *income* limit for SNAP."

89.     Ms. Colbert appealed the denial of her SNAP benefits on June 12, 2024.

90.     DHS erroneously denied Ms. Colbert's household SNAP benefits from June 1, 2024 to October 14, 2024.

91.     As grounds for her June 12, 2024 appeal, Ms. Colbert asserted that she was "denied due to income in which I have not been employed since April. Other reason [sic] was to provide my lease with my son on in which that was denied November of last year. My lease and all other pertinent documentation has been uploaded prior to the decision for denial."

92.     After she filed her SNAP appeal, Ms. Colbert called to check on its status. DHS Administrative Appeals Clerk responded to her inquiry by stating, "The average time from appeal filed date to Order date is 60-90 days. Due to the high volume of appeals, processing time frames can take longer than 60-90 days."

93.     As a result of the long delays in her appeal, Ms. Colbert had to reapply on October 7, 2024.

94.     On October 15, 2024, Ms. Colbert was approved for SNAP benefits 146 days after her May 22, 2024 application. The underlying facts and her household's SNAP eligibility, including her household's income, had not changed between May 2024 and October 2024.

95.     The hearing on Ms. Colbert's appeal was first set in person at the Knox County DHS office for November 5, 2024—*146* days after her appeal was filed.

96.     Because the hearing was set to be in person in Knoxville and her counsel was located in Nashville, Ms. Colbert through counsel moved for the hearing to take place telephonically on November 5, 2024.  DHS treated this motion as a request for a continuance and eventually held the hearing on November 19, 2024.

97.     On December 11, 2024, a DHS Administrative Judge issued an order and ruled in favor of Ms. Colbert on her June 12, 2024 appeal.  The DHS Administrative Judge found that DHS had erred and had improperly denied the Appellant's application for SNAP benefits in the case. The order directed DHS to reprocess Ms. Colbert's application.

98.     In a letter issued by the Commissioner's Designee for DHS on January 7, 2025, DHS stated among other things that the "[D]epartment improperly denied your application for SNAP benefits in this case" and awarded her $4,281 in improperly withheld SNAP benefits between May and September 2024.

99.     Since May when she first applied for benefits, Ms. Colbert and her family have had to spend TANF funds on food that could have gone to pay for other expenses, to go to a food bank to get food, and have had to skip meals. These issues with obtaining food were compounded when the family became homeless on August 18, 2024 as a result of a lease expiring and financial difficulties.

*Tamika Davis*

100.     Tamika Davis is a 51-year-old resident of Davidson County who is currently unhoused. For purposes of SNAP, Ms. Davis is a household of 1.

101.     Ms. Davis applied for SNAP on September 23, 2024 via fax and obtained a confirmation receipt.

20

102.    At the time of her application and to present, Ms. Davis made less than $150 per month in income and had less than $100 in the bank. Ms. Davis, who also indicated she was homeless on her application, was therefore eligible to receive SNAP through an expedited application within 7 days.

103.    After she had not heard back about her application, Ms. Davis contacted the Tennessee Justice Center for help.  On October 28, 2024, TJC's Ashley Dorway contacted DHS and asked when DHS could provide a timeline for receiving her benefits.

104.    DHS indicated that they had an interview appointment scheduled for her on November 4, 2024 at 9:00 a.m. and that the team had been unable to contact Ms. Davis previously on September 30, 2024.

105.    Ms. Davis was present for the SNAP interview on November 4, 2024. At the interview, DHS requested a copy of identification and told her to bring it in or fax it to DHS. This was the only verification that DHS requested.

106.    Ms. Davis did submit her identification to DHS.  She took her identification to the Davidson County DHS office in Metro Center. DHS did not provide her with a receipt of the submission.

107.    As of January 2, 2025, Ms. Davis has not received her EBT card and has not received a Notice of Decision on her application.

108.    If she is not approved, Ms. Davis will have to submit another application and will have to go through DHS's application process again.

109.    If she is approved, Ms. Davis is subject to and will have to go through the recertification process every six months to continue to participate in the SNAP program.

*Missaes Desjardins and Household*

21

110.    Ms. Missaes Desjardins is 35 years old and has two children under 18. Ms. Desjardins and her two children live in Nashville, Tennessee in Davidson County. Ms. Desjardins is in a household of three for purposes of SNAP.

111.    Ms. Desjardins has received SNAP benefits since around 2023, but has been on and off the program. Ms. Desjardins is a former benefits specialist.

112.    In a Notice of Decision dated September 3, 2024, DHS indicated that Ms. Desjardins and her household were still eligible for SNAP benefits and that she would receive $768 in benefits as of October 1, 2024.

113.    The Notice DHS sent to Ms. Desjardins stated the following, in relevant part:

If you are a Simplified Reporting household, you must report the following changes:

If the amount of money that comes into your household goes above the gross income limit of $1,580.00 for your household size in a month, you must contact us within the first ten (10) days of the month following the month the change occurred.

If someone in your household is an ABAWD (Able bodied Without Dependents) whose hours go below an average of 20 hours per week, you must contact us within the first ten (10) days of the month following the month the change occurred.

If someone in your household wins $4,250.00 or more from the lottery or gambling, report this information 10 calendar days of the receipt of the winnings.

Non-simplified reporting households are required to report changes within ten (10) days of the date the change becomes known to the household.
Households approved for SNAP will continue to receive them unless there is a change in their situation.

114.    Ms. Desjardins was not told by DHS whether she was subject to simplified reporting or not.

115.    In a Notice of Decision dated September 13, 2024, DHS indicated that Ms. Desjardins and her household would be terminated from SNAP as of September 30, 2024. The

22

only reason listed on the Notice of Decision was "Your income exceeds the income limit for SNAP."

116.    Ms. Desjardins did not receive the Notice of Decision dated September 13, 2024 until September 28, 2024.  She does not know and has not been provided with the basis or source for DHS's assertion that her income exceeded the income limit for SNAP.

117.    Because she did not receive the Notice of Decision until September 28, 2024, Ms. Desjardins was unable to ask for Continuation of Benefits.

118.    During the periods in which she had disruptions to her SNAP benefits, Ms. Desjardins made several trips to the Davidson County DHS office in Metro Center. One week, she had to go to DHS on three separate occasions. On one of these occasions, she had to wait 4.5 hours to see a DHS worker. On another, she had to wait 1.5 hours.

119.    On October 1, 2024, Ms. Desjardins submitted a SNAP appeal to DHS. The appeal sought to address, among other things, her termination from the program referenced in the Notice of Decision dated September 13, 2024.

120.    DHS did not issue a written decision on Ms. Desjardins' October 1, 2024 appeal within 60 days.  The appeal remains pending.

121.    On October 31, 2024, Ms. Desjardins submitted a new application for SNAP.

122.    On November 19, 2024, DHS approved Ms. Desjardins' SNAP application filed on October 31st. This Notice of Decision for her SNAP approval stated that she would receive $696 for her household from October to December 2024.

123.    Ms. Desjardins' income and her qualifications for SNAP did not change between September 13 and October 31, 2024 and she remained eligible for SNAP during this period.  DHS calculated her income incorrectly during this period.

23

124. Ms. Desjardins was without SNAP between September 30 and November 19, 2024.

125. During the period she was without SNAP benefits, Ms. Desjardins had to forgo eating food, obtain food from friends, food banks, and neighbors, and forgo payment on other bills.

126. Ms. Desjardins will go through the DHS SNAP application process again. Her appeal remains pending.

*Emily Gugliemelli and Household*

127. Ms. Gugliemelli, age 32, her fiancé, Nathaniel Arsenault, age 32, and her two children (5) years old and 5 months old reside in Cleveland, Tennessee in Bradley County.

128. Ms. Gugliemelli and her family have had SNAP benefits off and on since summer 2023.

129. On May 1, 2024, DHS sent Ms. Gugliemelli and her household a notice in the mail that her SNAP benefits were being terminated because she did not cooperate with the renewal process. The Notice stated, "You did not cooperate with us on the review/recertification of your eligibility." But Ms. Gugliemelli and her household had not refused to cooperate with DHS about SNAP recertification.



**Notice of Decision**

**SNAP**
Your SNAP case will be terminated on April 30, 2024 for the following reason(s):

| Reason |
| --- |
| You did not cooperate with us on the review/recertification of your eligibility |

130. On May 2, 2024, Ms. Gugliemelli and her household reapplied for benefits and were approved on May 8, 2024.

131.    On June 5, 2024, DHS once again terminated Ms. Gugliemelli and her household from SNAP because they allegedly failed to provide income verifications from Nathaniel. But this was not true, income verifications for Nathaniel's job had been submitted on May 14, 2024, as shown by the screen shots below from DHS' OneDHS portal, which date stamped the submission:



| | | | | |
|---|---|---|---|---|
| NATHANIEL ARSENAULT | 119299161 | Income verification | 05-14-2024 | View |
| LUNA GUGLIEMELLI | 119299161 | Verification of Citizenship | 05-02-2024 | View |
| EMILY GUGLIEMELLI | 119299161 | Miscellaneous | 05-02-2024 | View |
| EMILY GUGLIEMELLI | 119299161 | Affidavit Request for SNAP Replacements | 05-02-2024 | View |
| EMILY GUGLIEMELLI | 119299161 | Miscellaneous | 05-02-2024 | View |
| EMILY GUGLIEMELLI | 119299161 | Verification of Current Resident | 05-02-2024 | View |
| EMILY GUGLIEMELLI | 119299161 | Verification of Current Resident | 05-02-2024 | View |
| Nathaniel arsenault | T50469351 | Verification of Valid ID | 05-02-2024 | View |



132. On June 24, 2024, Ms. Gugliemelli appealed this termination on the basis that DHS had simply ignored the proof of income in the verifications that she had already submitted on May 2, 2024.

133. Ms. Gugliemelli once again applied on June 27, 2024. DHS approved Ms. Gugliemelli and her household for benefits on July 17, 2024.

134. Ms. Gugliemelli and her household were without SNAP benefits from June 5, 2024 to July 17, 2024.

135. For the month and a half that elapsed while awaiting approval on her new application, Ms. Gugliemelli and her family were forced to divert the limited amount of money in their savings funds to buy food as well as visiting local food banks in Cleveland. Further, Ms. Gugliemelli's health suffered. During this gap in benefits, Ms. Gugliemelli was eight months pregnant and needed nutrition to support herself and her (as yet) unborn child.

136. After waiting for a fair hearing to be scheduled, Ms. Gugliemelli finally received a hearing packet in the mail on September 9, 2024 with a hearing date of September 19, 2024. The scheduled hearing date was 87 days after her filed appeal.

137. Ms. Gugliemelli contacted the Tennessee Justice Center on September 16, 2024. To allow enough time for her attorneys to prepare for an administrative hearing, Ms. Gugliemelli's attorneys at TJC asked to continue the hearing. The hearing was continued to November 4, 2024.

138. On September 27, 2024, DHS issued a "Manual Issuance" notice notifying Ms. Gugliemelli and her family of an extra one-time amount of $446 added to their EBT card.

139. Based on the Manual Issuance, the parties entered into an Agreed Order of Withdrawal of the June 24, 2024 appeal, which was entered on October 11, 2024. This ended the earlier appeal.

140. However, on November 21, 2024 during the household's renewal, Ms. Gugliemelli's household's benefits were reduced by about $60 despite a new family member being added to the household.

141. The next day, on November 22, 2024, Ms. Gugliemelli and her household filed an appeal. The appeal asserts that DHS incorrectly calculated Nathaniel Arsenault's income based on an atypical payment schedule. The appeal is still pending as of the filing of this Complaint. No hearing has been set on the appeal and no written decision has been issued.

27

142.     Trista Hubbard, her spouse, and five children live in Knoxville. Before November 2023, the family received SNAP benefits.

143.     On November 13, 2023, Trista Hubbard submitted a SNAP application on behalf of her seven person household after losing benefits.

144.     In November 2024, Ms. Hubbard's oldest daughter moved back in with the family.

145.     On January 8, 2024, DHS issued a verification request to Ms. Hubbard that gave a deadline of January 16, 2024—less than 10 days, as shown by the screenshot below.



146.     On January 26, 2024, Ms. Hubbard's November 13, 2023 application was denied on the purported basis that a mandatory member refused or failed to verify required information for Liquid Resources, which Ms. Hubbard disputed.

147.     On March 7, 2024, Ms. Hubbard filed a SNAP appeal (No. 2403364914).

148.     On July 31, 2024, DHS sent a Notice of Hearing to Ms. Hubbard setting a hearing date of August 12, 2024 for the March 7, 2024 appeal (2403364914).

28

149.    On August 20, 2024, 166 days after Ms. Hubbard filed her appeal, a DHS Administrative Judge issued an initial order remanding the case to the agency after the Department admitted that there were errors in the original processing of the application.

150.    On September 6, 2024, nearly ten months after her initial application, DHS issued back SNAP benefits to Ms. Hubbard totaling $3,380.   Following the hearing, DHS issued benefits in the amount of $711.00 for November 13, 2023 through November 30, 2023, $411 for December 2023, $870 for January 2024, $812 for February 2024, and $576 for April 2024.

151.    The $3,380 in back benefits did not come soon enough. As a result of the SNAP denial and DHS's errors, Ms. Hubbard fell behind on her mortgage, spending money that would otherwise go to her mortgage payment on food that would otherwise be covered by SNAP.  When she fell behind, the bank initiated foreclosure proceedings, which, in turn, required Ms. Hubbard to file for bankruptcy to preserve her home, resulting in damage to her credit.

152.    Because Ms. Hubbard had to devote limited funds to pay for food items that otherwise would have been covered by her SNAP benefits, she has been late in paying expenses, which caused her car to be repossessed and her utilities to be briefly shut off, and needed to use credit cards to pay off bills and other expenses—maxing out her three credit cards in the process.

153.    Ms. Hubbard has also cut back on meals for herself and stopped eating dinner in order to make sure there was enough food for her children.  She asked family and friends for help feeding her household and relied on area food banks.

154.    Further, Ms. Hubbard's health suffered during the period without SNAP benefits. She experienced depression and anxiety due to the stress of having the SNAP denial and DHS errors.  Furthermore, Ms. Hubbard is pre-diabetic.  She experienced negative health issues because she was only able to afford cheap, often unhealthy food during this period, exacerbating her

ongoing blood sugar issues. Other members of Ms. Hubbard's household are pre-diabetic, so the family's reliance on cheap, often unhealthy food during this period negatively impacted them as well. In addition, Ms. Hubbard was unable to afford gluten-free food products for her son who requires gluten-free food for his dietary needs—resulting in her son experiencing frequent stomach aches.

155.     After being briefly approved for SNAP from May 16, 2024 to May 31, 2024, Ms. Hubbard and her family were terminated from the program.

156.     Ms. Hubbard and her household's income remains very close to the eligibility limit for SNAP currently.  Given this, the inconsistency income calculation and documentation request, and the issues that she and her family have faced with the November 13, 2023 application, it is likely that Ms. Hubbard will have to file a SNAP appeal again.

*Candice Jacques and Household*

157.     Candice Jacques, age 37, and her daughter, age 2, reside in Nashville, Tennessee in Davidson County. As a household of two, they have received SNAP benefits off and on since approximately August 2022.

158.     Ms. Jacques and her daughter were terminated from SNAP without notice on December 31, 2023. On January 2, 2024, DHS purportedly sent Ms. Jacques a Notice of Decision stating that her SNAP case was being terminated because "You did not cooperate with us on the review/recertification of your eligibility." But Ms. Jacques never received a renewal notice, notice of appointment, or a Notice of Decision.

159.     After she did not receive her benefits, Ms. Jacques contacted DHS in February. She was told by DHS that her case "timed out" due to not renewing.  On the call, a DHS representative

30

admitted that the agency failed to mail her a recertification notice and application to fill out and stated that it would not be hard to get benefits back since it was DHS's fault.

160.    Ms. Jacques reapplied for SNAP on February 20, 2024 and had an appointment interview scheduled on March 5, 2024, but DHS never called for the interview.  In response, DHS sent a "Notice of Missed Interview" to Ms. Jacques on March 6, 2024. DHS subsequently denied her application on March 21, 2024.

161.    After DHS failed to call, Ms. Jacques tried to reschedule, but Ms. Jacques was told that DHS was delayed in making calls.  DHS placed Ms. Jacques on a wait list.

162.    DHS again sent a Notice of Appointment to Ms. Jacques for April 26, 2024 and again failed to call her yet again at the scheduled time. After she called back, Ms. Jacques was told to reapply again.

163.    Ms. Jacques again submitted an application on April 29, 2024 and May 9, 2024.

164.    Ms. Jacques was finally approved for SNAP on May 10, 2024 for the months of April 2024 through September 2024.

165.    During times when she was trying to check on the reason for the delay, Ms. Jacques was on hold for long periods of time with DHS, sometimes between two and five hours.  On multiple occasions, Ms. Jacques will call and get hung up on without a call back. On one occasion, Ms. Jacques waited on hold for 2.5 hours and got hung up on. She called back and was placed on hold for another 1.5 to 2 hours. When someone at DHS answered, Ms. Jacques asked if she could please take down her phone number so the worker could call her back if they got disconnected, the worker indicated that DHS does not do that. One person who answered indicated that he does not normally work in the SNAP department and was just volunteering that day since the call times were so long.

31

166.     Ms. Jacques appealed on June 3, 2024 through appeal 2406402533.

167.     On July 23, 2024, DHS's Leann Thorton sent an e-mail stating that Ms. Jacques benefits were restored to February 20, 2024 through August 2024 and indicated that Ms. Jacques's appeal had been completely resolved.

168.     After multiple inquiries from Ms. Jacques about why the December 2023, January 2024, and February 2024 benefits were not provided, Ms. Jacques submitted an appeal on August 28, 2024, which stated:

| Why are you appealing? | Termination |
|---|---|
| Tell us why you're appealing or what happened that you disagree with: ||
| I haven't received snap benefits since my account was closed in Dec 2023. I saw in Feb. that my benefits stopped. I called & SNAP told me to submit a new app. b/c mine expired, not to worry that they had failed to send me a notification letter but it would be no problem to receive the back pay. Over that time period so many things went wrong. I got an original appt. 3/5/24 & no one called. I called to reschedule my appt. as the letter in the mail said.There were no appts. available at that time (beg. of March) so I was placed on a waitlist. I was told I would receive my new appt. time in the mail. After waiting 2 weeks I called back. SNAP said I was STILL on a waitlist, that they should be opening up new appt. times this week & to expect an update soon. It is now end of March & nothings come. No appt. was ever made, never received any mail, nothing. I call back at the beg. of April & SNAP assures me I'm still on a waitlist & will be receiving an appt. time soon. It's now end of April. After another 4 hour phone hold at the end of April, SNAP tells me I have to submit a new application because my old one "timed out". I submitted a new app. immediately & I assume bc of the desperate situation,  I received an appointment the following morning, April 26th, at 9 am. I had a friend come to help watch my child so there was NO way I could miss this call. The call never came. I used my friends phone to call snap starting at 9:03. At 11 someone answers & says that the employee had not marked me as a no show and that they were probably just running behind, hang tight and wait for the call. The call never came. I checked the portal & it said I was a no show. I called the next morn.  & an employee told me they dialled the wrong number. Even though the number was correct in your system and on their phone, they dialled wrong & marked me as missing my appointment. The employee told me to submit ANOTHER app. & start an appeal. Thank you for investigating & rectifying this! |

169.     On July 18, 2024, DHS sent Ms. Jacques several Manual Issuance notices notifying her that she would be receiving some back benefits based on her appeal.

170.     On July 23, 2024, Ms. Jacques received a message from DHS that her SNAP appeal had been reviewed and that she was being issued benefits for February 20 to 29, 2024, and March through August 2024.

171.     On August 28, 2024, Ms. Jacques filed an appeal seeking a hearing and restoration of benefits for December 2023 through February 19, 2024.  The appeal stated the following:

| Tell us why you're appealing or what happened that you disagree with: |
| --- |
| I did not receive a renewal notice and, as a result my SNAP benefits were terminated in December of last year. I reapplied February 20, 2024 and was approved May 10th. My SNAP benefits were backdated to February 20, but my request for restoration of SNAP benefits for December 2023 through February 19, 2024 was denied without a hearing. I request an appeal so that I can have a hearing to get back those lost benefits for December 2023 through February 2024. |

172.    On September 20, 2024, DHS denied Ms. Jacques' request for a fair hearing and closed her appeal. The agency stated that DHS took action on January 2, 2024 and the appeal was untimely because it was filed on August 28, 2024—more than 90 days after the action.

173.    DHS denied Ms. Jacques's request for restoration of benefits lost more than 90 days but less than a year prior to the request.

174.    Ms. Jacques and her daughter were not receiving SNAP benefits between January and May 2024 and August to October 2024. The period of time without SNAP benefits was incredibly stressful for Ms. Jacques. Ms. Jacques is a single-mom with a small child with no regular income.

175.    During the time without benefits, Ms. Jacques had to obtain food from the Bellevue food pantry and rely on help from friends from church.

176.    Without SNAP benefits, Ms. Jacques was forced to forgo payment on other bills to pay for food that would have otherwise been paid for with SNAP benefits. Because of the lack of SNAP benefits, Ms. Jacques could not pay her cell phone bill and lost coverage for several days, had to stop paying electric bills, and eventually had to move into low-income housing because of the instability and not knowing when they were going to receive SNAP benefits.

*Rez'hana Maddox and Household*

177.    Rez'hana Maddox is a 23-year-old resident of Davidson County, Tennessee. She is a single mother of one and is currently pregnant with her second child who is due in March. For SNAP purposes, Ms. Maddox is currently considered a household of two.

33

178.     Ms. Maddox began receiving SNAP in July of 2023. She was terminated from the program in December of 2023. Following the news of her second pregnancy, Ms. Maddox again applied for SNAP on May 2, 2024.

179.     After several failed application attempts and appeals, Ms. Maddox submitted another application for SNAP on August 5, 2024. This application was denied on August 26, 2024 for an alleged failure to verify required information for her liquid resources. But this was not accurate. Ms. Maddox had submitted everything DHS requested.

180.     When her August 5th application was denied on August 26th, Ms. Maddox appealed on September 20, 2024.  Because the DHS Notice of Decision was a denial of an application and not a termination, Ms. Maddox did not have continuation of benefits and did not have SNAP.

181.     The hearing date for Ms. Maddox's September 20, 2024 appeal was first set for hearing on January 9, 2025 through a Notice of Hearing dated December 30, 2024.  Ms. Maddox did not receive a written decision on her appeal within 60 days of submission.

182.     Ms. Maddox contacted DHS to ask how she could obtain SNAP benefits during the appeal and was told by DHS to submit another application.  Ms. Maddox did submit another SNAP application on November 15, 2024.

183.     Ms. Maddox and her household were approved for SNAP by DHS through a NOD dated November 22, 2024.

184.     After reaching out for help from the Tennessee Justice Center (TJC), a TJC caseworker was able to inquire on the status of Ms. Maddox's case with DHS in early December. DHS informed the caseworker that Ms. Maddox had provided all required information during her August application, and that she had been wrongfully terminated. On December 13th, DHS manually issued Ms. Maddox supplements totaling $720—84 days after her September 20, 2024 appeal.

34

185.    Between the period where Ms. Maddox's August application had been wrongfully denied and when she received a manual issuance supplement on December 13, 2024, Ms. Maddox was forced to rely on help from family and friends in order to meet her nutrition needs. She also had to forgo payment on other bills in order to pay for food that would have been covered by SNAP.

186.    Additionally, Ms. Maddox was five months pregnant at the time of her September 2024 appeal. DHS's wrongful denial of SNAP benefits placed additional pressure and stress on Ms. Maddox as to whether she would be able to afford groceries for herself and her unborn baby and pay other bills.

187.    After Ms. Maddox submitted a change report listing her new employer and hourly wage on December 9, 2024, DHS requested verifications for this income. Ms. Maddox submitted two pay stubs showing her new income.

188.    Yet, on December 27, 2024, DHS submitted a notice informing Ms. Maddox that her case was being terminated for being over-income despite DHS separately indicating that her case was terminated on the purported basis that two pay subs were not sufficient verification for income.

189.    Ms. Maddox submitted as much information as she had available and DHS had enough information to determine her wage. Despite this, DHS terminated her case without exhausting its verification methods. DHS is able to use the Work Number to verify her employer and wage and they did not appear to do so. Further, DHS never requested that Ms. Maddox submit a sworn statement attesting to her income, which is permitted under DHS policy.

190.    Ms. Maddox filed an appeal contesting her termination on January 6, 2025. Because of the risk that DHS might try to collect any overissuance, Ms. Maddox did not seek

35

continuation of benefits during the appeal. Ms. Maddox's current appeal is subject to DHS's current appeal processing delays.

*Sheray Ominyi and Household*

191.    Sheray Ominyi is a 45-year-old resident of Nashville in Davidson County, Tennessee. For SNAP purposes, Ms. Ominyi is a household of one.

192.    Ms. Ominyi has been on and off SNAP for a number of years and has been through the DHS's SNAP appeals and application processes multiple times.

193.    In May 2024, the amount that Ms. Ominyi received in SNAP benefits was lower than expected. In late May, she called DHS to understand why her monthly SNAP allotment was lowered. DHS stated that she had $1,500 from earned income and $800 from unearned income. Ms. Ominyi told DHS that those amounts were incorrect.

194.    During her multiple attempts to get an answer about the income amounts, Ms. Ominyi tried calling the DHS assistance line and was told to go to the local DHS office in Davidson County instead. When she went to the Davidson County office, workers there directed her back to the assistance line.

195.    When Ms. Ominyi did not receive her July benefits, she contacted DHS. On July 2, 2024, Ms. Ominyi personally dropped off her SNAP appeal concerning DHS's Application Processing at the Davidson County DHS office.

196.    In an NOD dated *August 9, 2024*, DHS told Ms. Ominyi "You SNAP case *will be terminated on June 30, 2024* for the following reason(s): You missed your renewal interview appointment." (emphasis added). Ms. Ominyi did not receive a written Notice of Decision in advance of her SNAP benefits being terminated.

36



**STATE OF TENNESSEE**
**DEPARTMENT OF HUMAN SERVICES**

Customer Name: Sheray Ominyi         Case Number: 204134702

Customer ID: 978782001         Date: 08/09/2024

Family Assistance Service Center: 1-866-311-4287

---

### Notice of Decision

**SNAP**

Your SNAP case will be terminated on June 30, 2024 for the following reason(s):

| Reason |
| --- |
| You missed your renewal interview appointment |

197.    Ms. Ominyi reapplied for SNAP on August 27, 2024.

198.    Ms. Ominyi was originally denied for SNAP on September 19, 2024 on the purported basis that she had not submitted a separation letter for earned income or loss of employment. But Ms. Ominyi had submitted those documents on September 3, 2024 and September 16, 2024.

199.    In an NOD dated September 27, 2024, DHS denied Ms. Ominyi's August 27, 2024 application on the basis that "There are no eligible members in your household."

200.    In a letter dated October 29, 2024, DHS first set a hearing on her July 2, 2024 appeal for hearing on November 8, 2024. Unlike most appeals, which occur telephonically, DHS set the hearing on Ms. Ominyi's appeal in person at DHS's offices near the Tennessee Performing Arts Center in downtown Nashville.

201.    On November 12, 2024, a DHS Administrative Judge issued an Initial Order of Default against Ms. Ominyi.

37

202.    On November 26, 2024, Ms. Ominyi filed a Petition for Reconsideration, which asserted that Ms. Ominyi made a mistake concerning the date of her appeal hearing and that the Notice of Hearing had been returned to DHS as undeliverable.

203.    Ms. Ominyi's Petition was subsequently granted in an Order entered on December 10, 2024.  The December 10, 2024 Order stated that the matter would be rescheduled for a new hearing date. As of the date of the filing of this lawsuit, a new hearing date has not been scheduled.

204.    On December 5, 2024, Ms. Ominyi filed a new SNAP application and completed her interview on December 11, 2024.

205.    In a letter dated December 12, 2024, DHS requested verifications of Ms. Ominyi's earned income from Industrial Staffing and gave her until December 23, 2024 to submit them.

206.    Before the December 23, 2024 deadline, Ms. Ominyi provided a letter to DHS explaining that she longer worked at Industrial Staff, had provided all of the paystubs that she had, and gave the contact information for Industrial Staffing for DHS to assist in obtaining the verifications.

207.    On December 26, 2024, Ms. Ominyi submitted an appeal for her application denial on September 27, 2024.  As of the filing of this lawsuit, the appeal is pending and Ms. Ominyi is subject to DHS' current appeals processing timeline.

208.    In an NOD dated December 27, 2024, DHS denied Ms. Ominyi's December 5, 2024 application.  The only stated reason for the denial was, "A mandatory member refused or failed to verify required information for Earned Income."

209.    At no point did Ms. Ominyi refuse to verify required information that DHS asked of her.

210. DHS did not contact Ms. Ominyi to determine whether she was refusing to provide required information.

211. At no point did DHS offer to assist Ms. Ominyi in obtaining verifications from Industrial Staffing or otherwise offer to help her obtain verifications.

212. On January 6, 2025, the dashboard on Ms. Ominyi's OneDHS portal account indicated that she had been approved for SNAP in the amount of $63.

213. Ms. Ominyi is on a fixed income and is currently unemployed. She relies on SNAP benefits to feed herself. During the periods in which she was without SNAP, she had to forgo payment on other bills to pay for food, forgo eating, or rely on friends in order get food.

214. Ms. Ominyi is currently in the SNAP administrative appeals process. Her July 2, 2024 appeal, was first set for hearing on November 8, 2024. After being reinstated, it has not been rescheduled. Further, Ms. Ominyi currently has another active appeal that was timely filed on December 26, 2024.

215. Because she qualifies, has a limited income, and needs SNAP to provide nutrition assistance, Ms. Ominyi will either go through the SNAP application again or, if her eligibility is reinstated, go through DHS's renewal process again.

*Candace Pegues and Household*

216. Ms. Candace D. Pegues is an adult resident of Memphis, Tennessee in Shelby County, who lives with three of her own children and three of her sister's children, who are currently in her custody. Ms. Pegues's SNAP benefits, which she had received in August and September 2023, stopped unexpectedly in October, November, and December 2023.

217.     On December 19, 2023, Ms. Pegues went to the DHS office in Shelby County to find out why her benefits had stopped. After speaking with an employee who directed her to sit down, Ms. Pegues waited for two to three hours.

218.     When Ms. Pegues was finally able to speak with an agent, she was told that one child's Social Security Number was missing and that according to DHS she had failed to respond to letters requesting it. Ms. Pegues told the agent that she had never received any letters, but the agent told her that DHS had closed her case.

219.     Ms. Pegues never received an explanation for why she received benefits in August and September if there was a problem with her documentation. The agent told Ms. Pegues she would have to submit a new application, which she did in person at the Shelby County DHS office that day on December 19, 2023.

220.     As of January 4, 2024, Ms. Pegues had not received any response from DHS about her December 19, 2023 application. She contacted Tennessee Justice Center for help.

221.     On or around January 22, 2024, Ms. Pegues received an interview call from DHS with no prior notice. The agent told her they would try to complete her application by the following day and that benefits would be deposited on that day.

222.     The following day, on or around January 23, 2024, Ms. Pegues checked her EBT card and saw no deposits. The caseworker called back and told Ms. Pegues that she was unable to complete the case because there was an error with Social Security Numbers on the application. After Ms. Pegues confirmed the SSN for a second time, the agent said that the SSN was correct in the paperwork Ms. Pegues had submitted but incorrect in the system. According to the agent, she could not change it in the system; instead, the system would have to "update itself."

223.    On January 26, 2024, 38 days after Ms. Pegues had first applied, benefits in the amount of $3,700 were deposited in Ms. Pegues's account.

224.    Ms. Pegues and her family are subject to DHS's application process in the future.

225.    During the period that Ms. Pegues went without SNAP benefits, she fell behind on rent and electricity bills because she had to forgo payment on those bills to pay for food that would otherwise be covered by SNAP benefits.  Ms. Pegues and her family had to rely on various other members of her family to make ends meet during this time. Occasionally, Ms. Pegues would miss meals in order to ensure that her children had enough food.

226.    During the period that Ms. Pegues went without SNAP benefits, she was forced to buy cheaper, more processed food for herself and her children. Ms. Pegues has hyperthyroidism. When she did not have SNAP benefits, her hyperthyroidism condition was aggravated, and her bloodwork numbers were high because she was having to eat cheaper, more processed food that was high in sodium.

*Brandi Tapia and Household*

227.    Ms. Tapia is a resident of Nashville, Tennessee in Davidson County. She applied for SNAP on September 22, 2023 for herself and her son.

228.    DHS sent Ms. Tapia a Notice of Appointment for an interview on October 27, 2023 and the interview was conducted as scheduled.

229.    When Ms. Tapia did not hear anything following the interview, she called DHS on November 3, 2023.  DHS told her that there was no record of the October 27, 2023 interview so she scheduled a second interview with DHS.

230.    At the second interview, which occurred on November 20, 2023, DHS stated that she needed to submit her last paystub by December 6, 2023. The DHS representative said that she

41

could approve Ms. Tapia that day if she submitted it before the DHS representative left that day. Ms. Tapia uploaded her paystub to the OneDHS portal on November 20, 2023.

231. Ms. Tapia again called DHS back on December 6, 2023 when she did not hear anything from DHS. Ms. Tapia was told that DHS never received her paystub—even though Ms. Tapia could see that it had been successfully uploaded on November 20, 2023 under the "My Submissions" tab in her OneDHS portal. She told the DHS worker that her OneDHS portal page showed that her paystub had been uploaded on November 20, 2023.

232. Nevertheless, Ms. Tapia re-uploaded her last paystub on December 6, 2023.

233. Hearing nothing, Ms. Tapia called DHS on December 18, 2023 and was again told that DHS had not received the requested paystub, so Ms. Tapia uploaded her paystub a third time to her OneDHS account that day. She called DHS again and a DHS representative confirmed that they were able to view her income verification document. Hearing nothing, Ms. Tapia called DHS on January 4, 2024 and was told her application was denied because her paystub had not been uploaded and that she had to reapply for SNAP benefits, which she did.

234. Ms. Tapia appealed the denial of her September 2023 application on January 10, 2024 through appeal number 240136681.

235. Ms. Tapia was sent a Notice of Appointment for an interview in mid-February, but did not receive a call from DHS.

236. Ms. Tapia called DHS again and waited on hold for three hours—only to get re-scheduled.

237. Ms. Tapia finally had her interview with DHS on February 23, 2024 and was told to upload her verifications, which she again did. Ms. Tapia's eligibility information had not

materially changed from her earlier application. DHS finally approved her February application for benefits on February 29, 2024.

238.    Ms. Tapia's appeal was not set for hearing until May 24, 2024, which was *135* days from the filing of her appeal on January 10, 2024.

239.    The DHS Notice of Hearing packet, which included records from her case, stated that the basis for DHS's denial was that Ms. Tapia had failed to submit all requested verifications by the required deadline for the purposes of SNAP eligibility. The DHS Notice of Hearing packet *itself* showed copies of Ms. Tapia's paystub, the screenshot of Ms. Tapia's OneDHS portal page showing that she had submitted the requested income verifications by each deadline, and an internal case note in December indicating that the worker could see the document in the OneDHS portal.

240.    After receiving the Notice of Hearing packet, Ms. Tapia called DHS to ask how to submit a video to DHS of her accessing her OneDHS portal submissions page to show that she had submitted the requested verifications. DHS told her that they could not accept video files as part of the hearing, so she uploaded a screenshot of her OneDHS portal page that showed the income verifications had been uploaded previously on November 20, 2023 and December 6, 2023 (shown below in relevant part).

43



241.    At the hearing on May 24, 2024, Ms. Tapia requested a continuance so that she could obtain legal counsel.

242.    Following the hearing, a TJC attorney got in contact with a DHS attorney. The DHS attorney informed TJC that DHS did already have the disputed submission in its possession.

243.    Around July 5, 2024, Ms. Tapia was ultimately awarded $1,646 in back benefits for this time period.

244.    DHS's wrongful denial of Ms. Tapia's SNAP benefits caused her to be evicted. Ms. Tapia was put in a situation where she had to spend money on food for her son or pay rent. She chose to feed her son and was evicted for failure to make timely rent payments.

245.    DHS will request verifications from Ms. Tapia in the future. Given the repeated issues that DHS has in being unable to locate a verification that has been provided repeatedly over several months, Ms. Tapia is likely to have to submit SNAP appeals in the future on this or another basis.

**APPLICATION DELAY CLASS ALLEGATIONS**

Application Delay Class - Definition

44

246.  Plaintiffs seek certification of an "Application Delay Class," consisting of:

"all Tennessee residents who since December 10, 2023 have applied, are applying, or will apply for SNAP benefits through an initial or recertification application and who have not or will not receive an eligibility determination from DHS within the legally required timeframes.  This definition specifically excludes those whose applications are voluntarily withdrawn before the processing deadline."

247.  Plaintiffs Davis and Pegues will represent the Application Delay Class.

<u>Application Delay Class – General Class Allegations</u>

248.  Thousands of Tennesseans apply for SNAP every month, and each month thousands more must recertify their eligibility. At a January 24, 2024 legislative hearing, representatives from DHS testified that the agency typically receives between 2,500 and 3,500 SNAP applications *per day*, including normal, expedited, and recertification applications.

249.  Thousands of those applications are not processed by DHS within required timeframes.

250.  From January 1 through March 31, 2024, DHS had 69,657 overdue initial normal applications, 35,016 overdue initial expedited applications, and 10,872 overdue recertification applications.

251.  Between April 1 and June 30, 2024, DHS had 22,882 overdue initial normal applications, 20,124 overdue initial expedited applications, and 27,989 overdue recertification applications, that were eventually approved for SNAP benefits.

252.   Between July 1 and September 30, 2024, DHS had 8,576 overdue initial normal applications, 7,363 overdue initial expedited applications, and 4,351 overdue normal and expedited recertifications.

253.   SNAP application processing timeliness (APT) rates are reported quarterly by DHS to USDA. Timeliness is calculated by dividing the number of cases timely processed by the number

of cases subject to the timeliness measure, but these rates are not subject to audit by FNS and can contain assumptions that make the state agency's timeliness appear better than it actually is.

254. Subject to these important caveats as to their reliability, APT rates below 95% are considered to be *unacceptable* by USDA.

255. Since 2011, DHS has self-reported annual APT rates varying between 70.48% and 90.53%, but never above 95%.

256. In 2023, the most recent self-reported annual APT rate at the time of filing of the Complaint, Tennessee's annual APT rate was *70.48%—*the lowest rate it has reported to USDA between 2011 and 2023.

257. As of March 2024, DHS reported that its cumulative APT rate for fiscal year 2024 to that point (October 2023 through February 2024) was *41.48%.*

258. DHS's self-reported rate has fluctuated between being near the worst performers among states and territories in the United States to, at best, the top of the bottom half of states.

259. Since 2011, Tennessee has had the following annual APT rates according to the USDA:

| Year | APT Rate | Rank among 53 Jurisdictions |
|------|----------|------------------------------|
| 2011 | 73.51% | 49 of 53 |
| 2012 | 78.81% | 45 of 53 |
| 2013 | 78.44% | 46 of 53 |
| 2014 | 84.59% | 39 of 53 |
| 2015 | 90.53% | 30 of 53 |
| 2016 | 87.14% | 43 of 53 |
| 2017 | 81.12% | 52 of 53 |

46

| 2018 | 78.44% | 50 of 53 |
|---|---|---|
| 2019 | 90.37% | 32 of 53 |
| 2020 | No data – COVID | No data - COVID |
| 2021 | No data – COVID | No data - COVID |
| 2022 | 82.99% | 34 of 53 |
| 2023 | 70.48% | 44 of 53 |

260.　Application processing timeliness is also evaluated with state-reported Quality Control (QC) data, which is based on more detailed case records from a subset of applications. This QC data is compiled by state employees who are sequestered from other DHS employees, subject to a regression analysis, and, importantly, is subject to audit by FNS who can re-sample.

261.　Though flawed itself, DHS's state-reported QC data, which is subject to audit by FNS, shows much lower APT rates than its self-reported rate, which is not.

262.　DHS systematically fails to provide eligible applicants with an "opportunity to participate" by delivering a loaded EBT card and ready-to-use PIN within 30 days of application, as required by federal law. 7 C.F.R. § 274.2(b).

263.　Even though processing and approval of applications often exceeds 30 days, a DHS spokesperson has acknowledged that, once a household is approved, the agency takes up to 15 *additional* business days (three weeks) to deliver the card and PIN to the household.

264.   In a March 20, 2024 email, DHS Legislative Liaison Mary Dobbs told a SNAP recipient who had been approved to "allow up to *15 business days* from this date for the customer to receive the card." (emphasis added).

265.   DHS systemically fails to mail active, loaded EBT cards with a PIN ready to use by the 28th day or 27th day from the submission of a normal SNAP application by a household that DHS determines eligible.

266.    For example, Plaintiff Candace Pegues received benefits on her EBT card 38 days after her December 19, 2023 application.

267.   DHS systemically fails to provide households who initially apply and who are eligible for expedited status with an opportunity to participate within seven days.

268.   DHS routinely fails to screen and identify SNAP applicants at the time of application for eligibility for expedited processing.

269.   Plaintiff Tamika Davis stated that she was homeless on her SNAP application and yet was not screened (much less approved) for SNAP within seven days of her application.

270.   DHS systemically fails to mail active, loaded EBT cards with a PIN ready to use by the fourth day following the submission of an application by a household who is eligible for expedited processing.

271.   DHS systematically fails to provide recertification households benefits if the household submits an application by the 15th day of the month their SNAP benefits expire.

272.   DHS systematically fails to send timely Notices of Expiration to households that need to recertify their eligibility for the Program, resulting in eligible households losing benefits during the processing of their recertification applications.

273.    DHS's failure to send required notices was previously documented. In a report issued by the USDA to DHS in 2021, the USDA stated that it "was unable to verify if applicable notices were issued to the household."

274.    DHS has routinely failed to schedule interviews on time to meet processing deadlines.

275.    Individuals have reported interviews being scheduled several weeks or even months after an application.

276.    And while DHS's self-reported APT rate is poor on its face, the actual timeliness rate for application processing is worse than the numbers suggest, because the agency has taken unlawful shortcuts to try to obscure the extent of its noncompliance. Through such shortcuts, the agency has purported to show it has reduced the backlog of application delays, when it has actually failed to correct DHS's chronic noncompliance.

277.    One unlawful shortcut that DHS employs to try to reduce its backlog of applications involves its manipulation of the requirement that applicants participate in an interview as part of the eligibility determination process. 7 C.F.R. § 273.2(a)(2). DHS makes it impossible for applicants to complete the interview process by failing to provide sufficient advance notice of the interview, then uses that failure to deny benefits for "refusal to cooperate" with the agency in determining their eligibility. The practice flouts a federal prohibition against denying eligibility for refusal to cooperate without having first made a finding that a missed interview was the result of the applicant's *refusal* rather than mere failure to comply. 7 C.F.R. § 273.2(d)(1).

278.    DHS's misuse or misrepresentation of missed interviews to deny eligibility for refusal to cooperate takes several forms.  DHS unilaterally schedules interviews and purports to mail advance notice to applicants informing them when to expect a call for their telephone interview.

49

In practice, DHS terminates individuals for failing to participate in an interview when DHS staff did not make the interview calls at all, provide *any* advanced Notice of Appointment or Interview, give sufficient advanced notice of an interview to reasonably enable an applicant to attend the scheduled appointment, or determine whether the individual was actually refusing to cooperate or merely missed the appointment.

279.   At a January 24, 2024 legislative committee hearing, DHS Assistant Commissioner Callon Schmid acknowledged that a number of individuals had not received interviews during the scheduled times because of various issues including other interviews taking too long and because DHS's call system erroneously showed that a call had occurred when it had not. Although DHS officials represented that those problems had been corrected, the same systemic problems have persisted since their testimony on January 24, 2024.

280.   Further, aside from failing to call applicants and participants for their interviews, DHS fails to provide any notice or sufficient advanced notice of the interview to many applicants and enrollees. Federal law requires that, in scheduling interviews, DHS accommodate applicants' work schedules to the extent practicable, but DHS makes no pretense of doing so, simply scheduling telephone interviews unilaterally and requiring individuals to be available for the agency's call. 7 C.F.R. § 273.2(e)(3).

281.   Many times, DHS does not provide *any* Notice of Appointment and Interview. In a 2021 report, USDA found that the Notice of Appointment and Interview was missing from 29 of 85 (34%) of DHS SNAP cases that the federal agency reviewed.

282.   Problems persist when the agency does send Notices of Appointment and Interview. DHS officials have been aware that their agency's automated eligibility system lacks elementary programming safeguards that would compare dates a notice is issued with dates of scheduled

50

interviews, to ensure that households receive adequate notice in advance. DHS's system even permits the issuance of notices *after* the appointment has already passed. For example, DHS issued a Notice dated *March 8, 2024*, for a scheduled interview on the preceding day, *March 7, 2024*.



283.  In instances when DHS does send a Notice of Appointment for an interview, it often mails the notice one day or two days before a scheduled interview, which does not leave enough time for the United States Postal Service to deliver the notice to the individual before the interview. For example, as shown in the screenshot below, DHS sent a Notice of Appointment for an interview on April 8, 2024 for a 10:30 a.m. CT interview on April 9, 2024.



STATE OF TENNESSEE
DEPARTMENT OF HUMAN SERVICES

Customer Name: ███████
Customer ID: ███████
Family Assistance Service Center: 1-866-311-4287

Application Number: ███████
Date: 04/08/2024

**Notice of Appointment**

You have been scheduled for the following **telephone interview appointment.**

 Date: 04/09/2024          Time: 10:30 AM CST/11:30 AM EST.

284.   As another example, DHS sent one SNAP applicant a Notice of Appointment for an interview scheduled at 8:00 a.m. CT on June 14, 2024 on June 12, 2024.

285.   In cases where an applicant or participant misses an interview, DHS is required to send a Notice of Missed Interview describing how the household can still meet the interview requirement to qualify for benefits. 7 C.F.R. § 273.2(e)(3). But in the same 2021 report, USDA reviewers determined that the Notice of Missed Interview was missing from 5 of 85 (6%) of cases reviewed. This practice continues today.

286.   To reduce the application backlog on paper, DHS has also scheduled interviews in bulk knowing that the practice would result in a substantial number of terminations. When Defendant Carter and other DHS officials were called to specially testify before the Tennessee Senate Health and Welfare Committee on January 24, 2024 about DHS's SNAP administration problems, DHS stated it had a "pretty significant application backlog" (22:24 of 54:45) with *35,000* applications that were older than 30 days (25:46-25:59 of 54:45)—roughly equivalent to the entire population of Cookeville, Tennessee (population 34,842).

52

287. In the Committee testimony, a DHS official stated it planned on "executing *35,000* interviews" the week of January 22 to January 26, 2024 (29:07 to 29:49 of 54:45) (32:59) and had completed 14,500 as of the night of January 23, 2024 (30:00 of 54:45) (emphasis added). DHS officials completed these calls despite acknowledging that: a "common problem that [DHS] is seeing is missed interviews" (28:06 of 54:45), DHS often failed to call individuals within the time it said it would (e.g., due to inability to finish other interviews during the scheduled time), and DHS's records erroneously showing that it had placed interview calls that were never received. It made the calls without confirming that those known defects had been corrected.

288. DHS stated that it had roughly 1,400 DHS employees who were actively working the application delay problem (41:48 of 54:45) and indicated that an interview typically lasts "on a good day" between 30 and 45 minutes (42:04 of 54:45, 50:00 of 54:45).

289. Based on the call volume, the average length of a completed call, and short time span in which they were made, DHS anticipated that a substantial portion of these interviews would be missed—ultimately leading to denials or terminations that would reduce the application backlog on paper.

290. As of January 22, 2024, when the 35,000 calls took place, DHS's own records show that the no show rate for eligibility phone interviews for applicants was *42%.*

291. Indeed, in a response to a public records request, DHS indicated that "Failed to Keep Application Appointment" or interview was the *top* reason for SNAP application denials—accounting for 83,343 denials or 24.75% of all denials from January 1, 2024 to October 8, 2024.

292. However, DHS's attempt to reduce the backlog has been short-lived. Because many individuals who were denied for missing an interview will reapply and are eligible, this apparent

53

reduction in the backlog has been temporary. And those who were denied are permanently deprived of benefits for the period between their denial and their reapplication.

293.    DHS routinely terminates or denies individuals without assessing whether a missed interview is the result of a household's *refusal* to comply or mere failure to comply—including the 35,000 individuals called for interviews in January 2024. Indeed, "Failed to Keep Application Appointment," which DHS disclosed as the *top* reason for SNAP application denials from January 1, 2024 to October 8, 2024, contains *no* reference to a finding of an individual's refusal to cooperate or participate with application process.

294.    DHS incorrectly terminated or denied Plaintiffs Bull, Gugliemelli, Ominyi, and Hubbard, among others on the basis that they failed to cooperate with DHS without assessing whether the household members actually refused to comply.

295.    Another shortcut that DHS takes is with verifications. DHS is required to give applicants and enrollees at least 10 days to submit requested verification of eligibility, but has consistently failed to do this for applicants and participants.

296.    In the report issued by the USDA to DHS in 2021, the USDA stated that DHS "failed to allow 10 days for the client to provide requested verification" as one of its findings. The conclusion was supported by evidence that DHS failed to allow 10 days for households to provide verifications in *28* of 85 (33%) of cases reviewed.

297.    The failures cited by USDA in the 2021 report continue today.

298.    For example, DHS provided Plaintiff Trista Hubbard with eight days to return requested verifications and then terminated her. DHS gave Ms. Hubbard a January 16, 2024 deadline to submit verifications through a Request for Verification issued January 8, 2024 and subsequently terminated her for failure to submit those verifications on time.

54

299. Part of the reason why DHS has given applicants less than 10 days to submit verifications is because the agency lacks the capacity to timely review and process verifications once it receives them. In a May 15, 2024 e-mail from DHS Legislative Liaison Mary Dobbs to an advocate for a SNAP Applicant, Ms. Dobbs acknowledged that once a verification is received by DHS, it takes *10-15 days* for it to be reviewed and processed.

300. Regardless of the reason, DHS's inability to process verifications on time impairs its overall ability to timely process applications.

301. Thus, DHS's failure to allow households at least 10 days to verify their eligibility not only allows the agency to obscure its inability to timely process applications, it also results in wrongful denials of eligibility—based on inaccurate findings that households have failed to timely respond to requests for verification.

302. For example, Ms. Hubbard and her family were incorrectly terminated from SNAP based on DHS's contention that she and her family failed to timely respond to requests for verification.

303. Plaintiffs Bull, Gugliemelli, and Tapia also were also incorrectly terminated or denied for failing to submit verifications that they did in fact submit.

304. As a result of DHS's delays in processing normal applications, expedited applications, recertification applications, and verifications, individuals have experienced gaps in their benefits—in many cases due to no fault of the applicant.

305. Because of delays with DHS's SNAP application processing, individuals like Candace Pegues and Tamika Davis have been and continue to be harmed. SNAP applicants and enrollees, like Plaintiffs Pegues and Davis, have gone hungry, had to forgo meals, had to rely on

friends and family for food assistance, have devoted money allocated for other expenses to pay for food, fell behind on rent, utilities and other expenses, or had their credit and finances suffer.

<u>Application Delay Class - Numerosity</u>

306.    The Application Delay Class is so numerous that joinder is not possible. Further, the class includes individuals who will apply or recertify for SNAP in the future, making joinder impractical.

307.    As set forth above, the class includes thousands of individuals by DHS's own records. As referenced above, DHS has reported to USDA that, between April 1 and June 30, 2024, DHS had 22,882 overdue initial normal applications, 20,124 overdue initial expedited applications, and 27,989 overdue recertification applications, that were eventually approved for SNAP benefits.

308.    Between July 1 and September 30, 2024, DHS had 8,576 overdue initial normal applications, 7,363 overdue initial expedited applications, and 4,351 overdue normal and expedited recertifications.

<u>Application Delay Class – Common Questions of Law or Fact</u>

309.    There are common questions of law and fact concerning whether the failures in Defendant's administration of SNAP deprived class members timely access to SNAP benefits. These include:

a)      whether Defendant fails to timely process initial applications within the applicable legal time limits;

b)      whether Defendant fails to timely provide Notices of Expiration and recertification applications;

c)      whether Defendant fails to timely process recertification applications;

d)      whether Defendant fails to call individuals for scheduled interviews;

e)      whether Defendant fails to timely send, or to send at all, notice of a required Appointment or Interview to applicants;

56

f)      whether Defendant fails to assess whether application delays are the fault of the agency or the household;

g)      whether Defendant provides applicants with at least 10 days to return requested verifications;

h)      whether classwide declaratory relief is appropriate to remedy Plaintiffs' injuries: and

i)      whether classwide injunctive relief is appropriate to remedy Plaintiffs' injuries.

<u>Application Delay Class – Typicality of Claims</u>

310.   Plaintiffs Pegues and Davis are appropriate class representatives because their claims are typical of the class claims. Like the absent class members, Plaintiffs' SNAP applications were not timely processed.

<u>Application Delay Class – Fair and Adequate Representation of Class</u>

311.   There are no conflicts of interest among Class members.

312.   The Tennessee Justice Center, Hogan Lovells, DLA Piper, and MAZON will provide adequate class representation for the Application Delay Class. The undersigned attorneys are experienced in class action litigation involving violations by state agencies of federal law and the Constitution in the agencies' administration of public benefits.

313.   For example, attorneys for the Tennessee Justice Center successfully obtained a class action ruling in a class action seeking injunctive and declaratory relief against TennCare concerning its redetermination process and have extensive history litigating class actions involving public benefits. *A.M.C. v. Smith*, 3:20-cv-240, 2024 U.S. Dist. LEXIS 152563 (M.D. Tenn. Aug. 26, 2024). The case is ongoing.

314.   Hogan Lovells is one of the largest law firms in the world. Desmond Hogan who leads the Hogan Lovells team in this action has extensive litigation experience in class actions and multidistrict litigation. He has served as lead counsel or co-lead counsel in scores of class

57

actions. These include the dozens of class actions comprising the following Multi-District Litigations: *In re Multiplan Health Insurance Provider Litigation*, (MDL-3121); *In re Uber Technologies, Inc., Data Security Breach Litigation* (MDL-2826); *In re Anthem, Inc. Data Breach Litigation* (MDL-2617); *In Re Blue Cross Blue Shield Antitrust Litigation* (MDL-2406); and *In re Wellpoint, Inc*., *Out-Of-Network UCR Rates Litigation* (MDL-2074) No. 2:09-ml-02074 (C.D. Cal. 2016). He has served as lead Plaintiffs' counsel in numerous class actions and other pro bono matters, including *Moore v. Secretary of the Department of Homeland Security* (D.D.C., 00-cv-095) (settled in 2017 with payment of nearly $25,000,000 to class and comprehensive injunctive relief); *McCollum, et al. v. Roberson County, et al.* (E.D.N.C., 15-cv-451) (winning $75,000,000 trial verdict for two intellectually disabled, wrongfully convicted men who spent 31 years in prison, mostly on death row, for a crime they did not commit); and *Gartrell v. Ashcroft* (D.D.C. 01-cv-1895) (winning nationwide injunction to protect the religious freedom of class members).

315. Hogan Lovells has substantial experience litigating access to benefits cases and previously litigated a class action asserting claims very similar to those asserted in the current litigation. *See Shonice G. Garnett, et al. v. Laura Zeilinger*, No. 1:17-cv-01757-CRC (D.D.C. 2018). As class counsel in *Zeilinger*, Hogan Lovells conducted an extensive investigation and engaged in thorough discovery and motions practice.

316. DLA Piper is also one of the world's largest law firms. Whitney Cloud who leads the DLA Piper team in this matter has substantial experience in litigating class actions and other mass litigation in federal and state courts across the United States, including: *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR (E.D. Pa. 2016); *Abdelghany v. S. Cal. Edison Co.*, No. 30-2021-01195715-CU-MT-CXC (Cal. Sup. Ct. 2021); *In re Hotel TVPRA*

*Litig.*, No. 2:22-cv-3845 (S.D. Ohio 2021); *A.W. v. Red Roof Inns, Inc., et al.*, 2:21-cv-4934 (S.D. Ohio 2021); and *Upsolve, Inc. v. Letitia James*, No. 1:22-cv-627-PAC (S.D.N.Y. 2022).

317.   DLA Piper has substantial experience litigating access to benefits cases and previously litigated a class action asserting claims very similar to those asserted in the current litigation.  *See Kamkoff v. Hedberg*, No. 3:23-cv-00044-SLG (D. Ak.).  As class counsel in *Kamkoff*, DLA Piper has assisted in substantially all aspects of the case including motions practice.

318.   Sarah Pratter, Director of Legal Advocacy, and MAZON have extensive substantive knowledge related to SNAP and public benefits. MAZON has filed and participated in numerous *amicus curiae* briefs related to SNAP and public benefit policy. These include: *Veterans Justice Group, LLC v. Secretary of Veterans Affairs*, 818 F.3d. 1336 (2016) (veteran SNAP access); *La Clinica de la Raza v. Trump*, 477 F.Supp.3d 951 (N.D. Cal. 2020) (and five other federal court litigations speaking to effect of public charge rule on older adults), *District of Columbia v. United States Dep't of Agric.*, 1:2020-cv-00119 (D.D.C. 2020) (challenging changes to statutory provisions on discretionary exemptions in the USDA final Rule at issue), among others.

319.   As evidenced by the detailed Complaint and supporting materials, Plaintiffs' counsel have conducted extensive research in identifying and investigating potential claims in the action. Plaintiffs' counsel also represent that they have sufficient resources to litigate the case to finality and to devote to expenses associated with litigation, including costs relating to discovery, transcripts, and any expert proffered.

Application Delay Class – Appropriateness of Classwide Declaratory and Injunctive Relief

320.   Classwide declaratory and injunctive relief are appropriate because Defendant has acted on grounds applicable to the class as a whole. Each Plaintiff and member of the class is subject to DHS's eligibility processing system process. In addition to being subject to the same

59

procedures for initial applications, each Plaintiff and member of the class who receives benefits must have their eligibility recertified regularly. The default length of certification period in Tennessee is six months, meaning that most households go through recertification twice per year. And while individuals who are disabled or elderly have a longer certification time (up to two years), they must still go through DHS's eligibility determination process again, for as long as they participate in the Program.

## APPEAL DELAY CLASS ALLEGATIONS

### Appeal Delay Class - Definition

321.   Plaintiffs seek certification of an "Appeal Delay Class," consisting of:

"all Tennessee residents who since November 10, 2023 have filed an appeal, are filing an appeal, or will file an appeal for SNAP benefits through DHS's administrative process and have not or will not receive an eligibility determination within the legally required timeframes. This definition specifically excludes those who voluntarily withdrew an appeal within 60 days of filing an appeal or who successfully sought a continuance of a fair hearing scheduled within 60 days of the filing of an appeal."

322.   Plaintiffs Bull, Colbert, Desjardins, Gugliemelli, Hubbard, Maddox, Ominyi, and Tapia will represent the Appeal Delay Class.

### Appeals Delay Class – General Class Allegations

323.   Thousands of Tennesseans appeal a DHS decision about SNAP every month. In a May 3, 2024 e-mail, DHS Assistant Commissioner Callon Schmid indicated that DHS received the following number of appeals per month:

| Month | Number of Appeals |
|---|---|
| June 2023 | 2,534 |
| July 2023 | 3,448 |

| | |
|---|---|
| August 2023 | 3,805 |
| September 2023 | 2,677 |
| October 2023 | 1,833 |
| November 2023 | 2,420 |
| December 2023 | 2,202 |
| January 2024 | 3,959 |
| February 2024 | 4,248 |
| March 2024 | 2,687 |

324. DHS systematically fails to issue written decisions from fair hearings within 60 days of the request for a fair hearing or within 60 days plus any additional days of postponement requested by the household.

325. From January to March 2024, DHS had *6,384 overdue* written decisions from SNAP administrative appeals.

326. From April to June 2024, DHS had *11,244 overdue* written decisions from SNAP administrative appeals.

327. From July 1 to September 30, 2024, DHS had *7,437 overdue* written decisions from SNAP administrative appeals.

328. DHS own data shows that for fair hearings that took place between June 1, 2024 and October 14, 2024, the total average days to disposition for these appeals was *137.8* days.

329. DHS is unable to reduce its appeal delays because it is receiving significantly more appeals than it schedules fair hearings to resolve. During the same period, July 1 to September 30,

61

2024, applicants or enrollees requested 9,495 fair hearings, but DHS was able to hold only 4,238 hearings despite only 1,476 appeal withdrawals.

330.    In May 2024, DHS stated that the current time for an appeal with DHS from a request for a fair hearing to a written decision, including SNAP appeals, was *129* days (4 months/120 days plus 7 business days/9 calendar days). In May 2024, DHS reported for all DHS appeals, not just SNAP, including those that are resolved prior to hearing, the average amount of time from a request for fair hearing to is *94* days. (emphasis added).

331.    In an email on May 3, 2024, DHS Assistant Commissioner for External Affairs Callon Schmid stated the following:

> The current, average amount of time for all appeals (not just SNAP) to be processed (filing date to closing date) is *94* days.  The average includes all types of appeals that are not accepted, not timely filed, and resolved prior to the hearing.  On average, the timeframe for an appeal that is filed and proceeds to hearing is *four* months.  Once heard, the Administrative Judges typically issue a decision within *seven business* days of the hearing.

 (emphasis added).

332.    On October 3, 2024, DHS Senior Policy Advisor Suzanne Carr responded on behalf of the agency to a list of questions from the Tennessee Justice Center to DHS and stated, "For appeals closed between 8/1/2024 and 9/17/2024, the average time from appeal filing date to closure was *106* (105.6 actual calculation) days." (emphasis added).

**Appeals**
- What is the current average amount of time for an appeal to be processed?
  For appeals closed between 8/1/2024 and 9/17/2024, the average time from appeal filing date to closure was 106 (105.6 actual calculation) days.

333.    From June 1, 2024 to October 14, 2024, 722 individuals did not receive dispositions on their SNAP appeals after 150 days after requesting a fair hearing.

62

334. Plaintiff Trista Hubbard, received a written decision remanding her case back to the agency based on admitted errors DHS made in her application process and that resulted in her being awarded over $3,300 in back SNAP benefits, 166 days after her initial appeal.

335. Plaintiff Kathryn Colbert filed an appeal on June 12, 2024. Her appeal was first scheduled for hearing 146 days after the appeal was filed.

336. Plaintiff Brandi Tapia had to wait over 135 days for a hearing to be scheduled on an appeal in which DHS's Notice of Hearing packet contained a screenshot of the verification that DHS said she had failed to provide.

337. Plaintiffs have ongoing appeals at the time of the filing of this action that have gone well beyond the 60 day period to receive a written decision. Plaintiff Missaes Desjardins has an ongoing appeal that was filed on October 1, 2024 that as of the filing of this lawsuit has not been scheduled for a fair hearing, much less received a written decision. Likewise, Plaintiff Bull filed an appeal on November 7, 2024 that as of the filing of this lawsuit has not been scheduled for a fair hearing, much less received a written decision.

338. The delays in receiving timely written decisions on appeals have caused and continue to cause harm to Plaintiffs.

339. For example, as a result of the appeal delay and DHS's processing errors, Ms. Hubbard fell behind on her mortgage. She had to spend money for food that would have been covered by SNAP that would otherwise go to her mortgage payment. When she fell behind on her mortgage, the bank initiated foreclosure proceedings, which, in turn, resulted in Ms. Hubbard having to file for bankruptcy to preserve her home, damaging her credit in the process.

340. DHS's wrongful denial of Ms. Tapia's SNAP benefits caused her to be evicted. Because of the delay in processing her appeal, Ms. Tapia had to spend money on food for

her son or pay rent. She chose to feed her son and was evicted for failure to make timely rent payments. As a result, Ms. Tapia's credit has suffered and her financial condition has gotten worse.

341.    While an appellant with existing benefits may request continuation of benefits during the pendency of an appeal, this stopgap is largely illusory.

a.    *First*, continuation of benefits is not available for initial applications (normal or expedited) at all.

b.    *Second,* there are significant deterrents to requesting continuation of benefits for appellants who receive SNAP benefits at the time of the appeal. DHS actively seeks recovery of the monetary value of continued benefits if the individual loses. The longer DHS takes to resolve an appeal, the more an appellant has to worry that, if they continue to pursue the appeal and accept benefits during its pendency, the more they will owe if DHS rules against them. Ms. Maddox is one such Plaintiff. As appeal resolutions are delayed, the amount of money potentially at risk for individuals to owe DHS following an appeal increases significantly and can be double the amount at stake under normal appeal processing.

c.    *Third,* the risk of erroneously losing and being forced to repay continuation of benefits during an appeal is increased because DHS does not provide advanced notices with adequate reasons listing the basis for termination or denial. Further DHS discourages individuals from applying for continuation of benefits by requiring appellants to "opt-in" to receive continuation of benefits, when DHS is actually required to allow appellants to "opt-out" of continuation of benefits, *see* 7 C.F.R. § 273.15(k).

342.    While Plaintiffs ultimately seek an efficient and lawful appeals process that is timely regardless of whether they prevail or not, a significant number of appeals subject to DHS's appeals delay are meritorious appeals where DHS's adverse decision was reversed. Plaintiffs

Colbert, Gugliemelli, Hubbard, Tapia, all had meritorious appeals that were decided or disposed of in their favor well after the 60 day deadline for written decision. Plaintiffs Colbert and Hubbard received over $4,000 and $3,000 in back SNAP benefits respectively from meritorious appeals that were significantly delayed.

343. Because a significant portion of DHS's eligibility determination are erroneous, SNAP appellants have a significant likelihood of having to file another appeal in the future.

344. For example, DHS reported that between April and June 2024, 20% of appeals that resulted in a written decision reversed the original agency decision. In 2020, over 29% of appeals that resulted in a written decision reversed the original agency decision.

345. Aside from processing, DHS's appeals process also contains misleading notices. DHS sends the same notice to every Appeals Delay class member (and to every SNAP applicant who receives a Notice of Decision) ("Yellow Notice"). Every Notice of Decision of adverse action contains a standardized appeal notice on yellow paper that purports to inform households of the right to appeal.

346. However, the Yellow Notice misrepresents that appeals "can take up to 2 months" when DHS officials are well aware that they take far longer than that. And nowhere does the notice contain the vital information that the "household's right to request a fair hearing" includes the right under federal law to receive a prompt written decision on their appeal (within 60 days). 7 C.F.R. § 273.15(c). The Yellow Notice states (in relevant part):

> Your SNAP appeal can take up to 2 months. Your Families First appeal can take up to 3 months. For additional information about the appeals process please visit our website at https://www.tn.gov/humanservices/division-ofappeals-and-hearings.html

347. The link to the referenced DHS controlled subpage, https://www.tn.gov/human-services/division-ofappeals-and-hearings.html, likewise contains no reference to the individual's right to receive a written decision on their appeal within 60 days.

348. DHS is in possession and control of all relevant records.

Appeal Delay Class - Numerosity

349. The Appeal Delay Class is so numerous that joinder is not possible. Further, the class includes individuals who will appeal an adverse action by DHS in the future, making joinder impractical.

350. As referenced above, the Appeals Delay Class includes thousands of individuals. From April to June 2024 alone, DHS had *11,244* <u>overdue</u> written decisions from SNAP administrative appeals.

Appeal Delay Class – Common Questions of Law or Fact

351. There are questions of fact and law that are common to Class members. Those include:

a)   whether Defendant fails to process appeals promptly and within 60 days;

b)   whether Defendant fails to issue written decisions for individuals who request fair hearings within 60 days;

c)   whether the failures in Defendant's administration of SNAP appeals delay members' access to benefits.

d)   whether Defendant's appeals notice fails to inform class members of their right to a decision within 60 days;

e)   whether Defendant's failure to timely process appeals harms unsuccessful appellants who request continuation of benefits by increasing their liability for repayment of benefits beyond the amount for which they would be liable if Defendant rendered a timely decision;

66

f)    whether classwide declaratory relief is appropriate to remedy Plaintiffs' injuries; and

g)    whether classwide injunctive relief is appropriate to remedy Plaintiffs' injuries.

<u>Appeal Delay Class – Typicality of Claims</u>

352.    Plaintiffs  Bull, Colbert, Desjardins, Gugliemelli, Hubbard, Maddox, Ominyi, and Tapia are appropriate class representatives because their claims are typical of the class claims. Like the absent class members, the Plaintiffs' SNAP appeals were not timely processed and they did not receive written decisions on their appeals within 60 days.

<u>Appeal Delay Class – Fair and Adequate Representation of Class</u>

353.    There are no conflicts of interest among Class members. As alleged above, the named Plaintiffs have legal representation capable of fairly and adequately representing the interests of the Class.

<u>Appeal Delay Class – Appropriateness of Classwide Declaratory and Injunctive Relief</u>

354.    Class-wide declaratory and injunctive relief are appropriate because Defendant has acted on grounds applicable to the class as a whole. Each Plaintiff and member of the class is subject to DHS's delayed appeals process, which harms them regardless of whether their appeals succeed or not.

**RESTORATION OF LOST BENEFITS CLASS ALLEGATIONS**

<u>Restoration of Benefits Class - Definition</u>

355.    Plaintiffs seek certification of a "Restoration of Lost Benefits Class," consisting of:

> "all Tennessee residents who since January 10, 2024, and within one year of an action by DHS adversely affecting their SNAP benefits, requested or will request restoration of SNAP benefits from DHS but were or will be denied a hearing because the request for restoration was or will be made more than 90 days after their loss of benefits."

356.    Plaintiff Jacques will represent the Restoration of Benefits Class.

67

<u>Restoration of Benefits Class – General Class Allegations</u>

357.    Under federal law, DHS is required to grant fair hearings to individuals who have lost benefits and consider untimely requests for hearings as requests for restoration of lost benefits up to a year after the adverse action. *See* 7 C.F.R. § 273.15(j)(1); 7 C.F.R. § 273.17.

358.    But DHS systematically does not do this. The agency does not grant hearings to individuals who request them after 90 days of an adverse action by DHS or treat untimely requests for hearings as requests for restoration of lost benefits.

359.    Based on DHS's own data, at least *150* requests for fair hearings were closed as untimely between June 1, 2024 and October 14, 2024.

360.    Further, from July to September 2024, 9,495 fair hearings were requested from DHS, yet DHS only conducted 4,248 during the same period—meaning that requested hearings during this period were either denied or delayed.

361.    DHS data elsewhere shows that 4,993 appeals that went to hearing between June 1, 2024 and October 14, 2024 had a disposition date above 60 days.

362.    Similarly, from April to June 2024, 7,340 fair hearings were requested but DHS only held 3,280 hearings—meaning that requested hearings during this period were either denied or delayed.

<u>Restoration of Lost Benefits Class - Numerosity</u>

363.    The Restoration of Lost Benefits Class is so numerous that joinder is not possible. Further, the class includes individuals who will seek restoration of lost benefits to DHS in the future, making joinder impractical.

68

364.    The Restoration of Lost Benefits Class includes hundreds of individuals if not more. Based on DHS's own data, *150* requests for fair hearings were closed as untimely between June 1, 2024 and October 14, 2024.

365.    Further, from July to September 2024, 9,495 fair hearings were requested from DHS, yet DHS only conducted 4,248 during the same period—meaning that requested hearings during this period were either denied, delayed, or resolved administratively.

366.    Similarly, from April to June 2024, 7,340 fair hearings were requested but DHS only held 3,280 hearings—meaning that requested hearings during this period were either denied, delayed, or administratively resolved.

<u>Restoration of Lost Benefits Class – Common Questions of Law or Fact</u>

367.    There are questions of fact and law that are common to the Class members. Those include:

a)  whether Defendant treats untimely requests for hearings as requests for restoration of lost benefits;

b)  whether Defendant systematically denies fair hearings to individuals who submit an appeal 90 days after an adverse event;

c)  whether Defendant's denial of fair hearings to individuals who allege an underissuance or denial of SNAP benefits has harmed the individuals;

d)  whether Defendant conducts inquiries as to whether the state agency is at fault for purposes of restoring lost benefits;

e)  whether classwide declaratory relief is appropriate to remedy Plaintiffs' injuries; and

f)  whether classwide injunctive relief is appropriate to remedy Plaintiffs' injuries.

<u>Restoration of Lost Benefits Class – Typicality of Claims</u>

368.    Plaintiff Jacques is an appropriate class representative because her claim is typical of the class claims.  Like the absent class members, Ms. Jacques submitted an appeal for an

underissuance or denial of SNAP benefits after 90 days, and despite a request for a hearing, was denied a hearing on her lost benefits by DHS.

<u>Restoration of Lost Benefits Class – Fair and Adequate Representation of Class</u>

369.     There are no conflicts of interest among Class members. As stated above, the Class has legal representation capable of fairly and adequately representing the interests of the Class.

<u>Restoration of Lost Benefits Class – Appropriateness of Classwide Declaratory and Injunctive Relief</u>

370.     Class-wide declaratory and injunctive relief are appropriate because Defendant has acted on grounds applicable to the class as a whole. Each Plaintiff and member of the class is subject to DHS's delayed appeals process, which harms them regardless of whether their appeals succeed or not.

**CLAIMS FOR RELIEF**

**First Cause of Action – Failure to Timely Process Applications**

371.     Plaintiff Contributor and Application Delay Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as if fully restated herein.

372.     Defendant causes Application Delay Plaintiffs and Plaintiff Contributor irreparable harm by the prevalent failure to process initial and recertification applications for SNAP within the time frames mandated by federal law, in violation of 7 U.S.C. § 2020(e)(2), (e)(3), (e)(4), and (e)(9) and implementing regulations, at 7 C.F.R. §§ 273.2(a)(2), (g)(1), (g)(3), (h), (i)(2), (i)(3)(i), (i)(4), 7 C.F.R. § 273.10(g), 7 C.F.R. § 273.14, and 7 U.S.C. § 2014(a).

373.     For Application Delay Plaintiffs who DHS finds eligible and Plaintiff Contributor, Defendant causes irreparable harm by the systemic failure to provide an opportunity to participate for SNAP by providing a usable EBT card with accessible benefits within the time frames mandated by federal law, in violation of 7 U.S.C. § 2020(e)(2), (e)(3), (e)(4), and (e)(9) and

70

implementing regulations, at 7 C.F.R. §§ 273.2(a)(2), (g)(1), (g)(3), (h), (i)(2), (i)(3)(i), 7 C.F.R. § 273.10(g), 7 C.F.R. § 273.14, and 7 U.S.C. § 2014(a).

374.    Relief is sought on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their federal statutory rights by persons acting under color of state law.

**Second Cause of Action – Failure to Timely Issue Fair Hearing Written Decisions**

375.    Appeal Delay Plaintiffs and Plaintiff Contributor reallege and incorporate the allegations set forth in the preceding paragraphs as if fully restated herein.

376.    The SNAP Act requires that DHS grant a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the State under any provision of its plan of operation. 7 U.S.C. § 2020(e)(10); 7 U.S.C. § 2020(e)(2).  Under the SNAP Act and implementing regulations, DHS is required to issue written decisions following fair hearing requests within 60 days of the request. 7 U.S.C. § 2020(e)(10); 7 C.F.R. § 273.15(c)(1); see also, 7 U.S.C. § 2020(e)(2). A household can request a postponement of a hearing for up to 30 days in which case DHS's obligation to provide a written decision extends by the amount of time requested. *Id*. If the written decision results in an increase in benefits, DHS is obligated to post the increase within 10 days of receipt of the decision. *Id.*

377.    DHS persistently fails to meet these deadlines in violation of 7 U.S.C. § 2020(e)(10); 7 U.S.C. § 2020(e)(2), and their implementing regulations.

378.    Relief is sought on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their federal statutory rights by persons acting under color of state law.

**Third Cause of Action – Failure to Provide Adequate Notices - Statutory Due Process**

71

379. Appeal Delay Plaintiffs and Plaintiff Contributor reallege and incorporate the allegations set forth in the preceding paragraphs as if fully restated herein.

380. By systemically failing to provide timely, understandable notices that afford households an accurate explanation of the basis for DHS's adverse actions, and right to a timely fair hearing, among others, Defendant violates the SNAP Act and its implementing regulations. 7 U.S.C. § 2020(e)(10); 7 C.F.R. §§ 273.10(g), and 273.13(a).

381. Relief is sought on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their constitutional rights by persons acting under color of state law.

### Fourth Cause of Action – Failure to Hold Hearings to Determine the Restoration of Lost Benefits - Statutory Due Process

382. Restoration of Lost Benefit Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if fully restated herein.

383. By systemically failing to provide fair hearings to individuals who have filed requests for lost benefits, Defendant violates the SNAP Act and its implementing regulations. 7 U.S.C. § 2020(e)(10); 7 U.S.C. § 2020(e)(11); 7 C.F.R. § 273.15(j)(1); 7 C.F.R. § 273.17.

384. Relief is sought on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their constitutional rights by persons acting under color of state law.

### Fifth Cause of Action – Constitutional Due Process

385. Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as if fully restated herein.

72

386. The Due Process Clause of the Fourteenth Amendment of the United States Constitution bars the state from depriving a person of her property, which includes SNAP benefits, without affording the individual adequate advance notice and a fair opportunity to be heard.

387. By the acts and omissions alleged above, Defendant has deprived and continues to deprive, Plaintiffs of due process of law in violation of the Fourteenth Amendment by:

    a. Creating a substantial risk of erroneous deprivation of SNAP coverage;

    b. Failing to provide adequate pre-deprivation notice, an opportunity for a fair hearing, an opportunity for a fair hearing at a meaningful time, and timely corrective action; and

    c. Subjecting otherwise eligible individuals to arbitrary denials of benefits and fair access to SNAP benefits.

388. Relief is sought on this claim pursuant to 42 U.S.C. § 1983, which provides a cause of action to redress the deprivation of their constitutional rights by persons acting under color of state law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1. Certify the proposed classes referenced above;

2. Enter declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Defendant's acts and omissions complained of herein:

    a) Violated the SNAP Act and its implementing regulations by failing to timely process initial applications for SNAP benefits; and failing to issue SNAP benefits to those eligible within time frames required by law pursuant to 7 U.S.C. §§ 2014(a), 2020(e)(3), and implementing regulations, 7 C.F.R. §§ 273.2(a)(2), (g)(9), and 273.10(g)(1);

73

b) Violated the SNAP Act and its implementing regulations by failing to timely process those applications for SNAP benefits entitled to expedited processing; and failing to issue Expedited SNAP benefits to those eligible within the timeframes required by law pursuant to 7 U.S.C. §§ 2014(a), 2020(e)(9), and implementing regulations 7 C.F.R. §§ 273.2(a)(2), (i)(2), (i)(3)(i), (i)(4), and 273.10(g)(1);

c) Violated the SNAP Act and its implementing regulations by failing to timely process recertification applications for SNAP benefits; failing to provide required eligibility notices; and failing to issue SNAP benefits to those eligible within the time frames required by law pursuant to 7 U.S.C. §§ 2014(a), 2020(e)(4), and implementing regulations, 7 C.F.R. §§ 273.2(a)(2), 273.10(g)(2), and 273.14;

d) Violated the SNAP Act and its implementing regulations by failing to timely issue a written decision for administrative appeals filed by applicants and members involving SNAP benefits within the time frames required by law pursuant to 7 U.S.C. § 2020(e)(2), (e)(10); 7 C.F.R. § 273.15(c)(1).

e) Violated the SNAP Act and its implementing regulations by failing to provide timely, understandable notices that afford households an accurate explanation of the bases for DHS's adverse actions, whether the household is subject to simplified reporting requirements and details about those requirements, and of the Plaintiffs' right to a timely fair hearing, in violation of 7 U.S.C. § 2020(e)(10), (e)(23); 7 C.F.R. §§ 273.10(g), 273.12(a) and 273.13;

f) Violated the SNAP Act and its implementing regulations by failing to provide fair hearings on valid requests for restoration of lost benefits in violation of 7 U.S.C. § 2020(e)(10); 7 U.S.C. § 2020(e)(11); 7 C.F.R. § 273.15(j)(1); 7 C.F.R. § 273.17;

g) Violated the Due Process Clause of the 14th Amendment to the United States Constitution by: creating a substantial risk of erroneous deprivation of SNAP coverage; failing to provide adequate pre-deprivation notice, an opportunity for a fair hearing, an opportunity for a fair hearing at a meaningful time, and timely corrective action; and subjecting otherwise eligible individuals to arbitrary denials of benefits.

3. Pursuant to Fed. R. Civ. P. 23 and 65, preliminarily and permanently enjoin Defendant as follows:

a) As to the Application Delay Class and Plaintiff The Contributor, preliminarily and permanently enjoin Defendant to:

i. Send a notice of delay to each class member whose initial or recertification application is not processed timely. The notice should state that the delay in processing the class member's application is in violation of federal law, that the class member can immediately file a delayed application appeal, and that the class member may have additional remedies under federal Civil Rights laws and may consult an attorney for more information regarding such remedies;

ii. Submit and, following court-approval, implement a remedial plan to ensure the timely, reliable processing of initial and recertification applications;

75

iii. Submit, for the duration of any preliminary or permanent injunction, monthly reports to Plaintiffs' counsel containing:

1. The number of overdue initial normal applications;

2. The number of overdue initial expedited applications;

3. The number of overdue recertification applications;

4. The SNAP FNS APT rate and supporting data;

5. The SNAP State APT rate and supporting data;

6. The SNAP APT rate as determined by state-reported QC data;

7. The number of timely application decisions, by type of disposition; and

8. The number of untimely application decisions, by type of disposition;

iv. Submit, for the duration of any preliminary or permanent injunction, to monitoring by Plaintiffs' counsel or a third party monitor appointed by the Court, whose expenses will be borne by or recoverable from the State pursuant to 42 U.S.C. § 1988. Such monitoring should include review of random samples of initial and recertification applications and such inspection of SNAP operations and Defendant's production of information as is reasonably required to assess the Defendant's compliance;

b) As to the Appeals Delay Class and Plaintiff The Contributor, preliminarily and permanently enjoin Defendant to:

i. Affirmatively state on its "Yellow Appeal Notice" that an appellant has a right to a written decision within 60 days of filing;

76

ii. Promptly send to class members whose appeals are pending 60 days without a decision, a notice stating "DHS is in violation of your right to a timely decision under 7 U.S.C. § 2020(e)(2), (e)(10) and implementing federal regulations. You may have remedies under federal Civil Rights laws. If you want more information regarding your rights and remedies, you should consult an attorney";

iii. Require DHS to allow all appellants to "opt-out" of continuation of benefits during the remainder of the certification period, *see* 7 C.F.R. § 273.15(k), rather than requiring them to "opt-in" in order to receive continuation of benefits;

iv. Submit, for the duration of any preliminary or permanent injunction, monthly reports to Plaintiffs' counsel containing:

    1. The number of SNAP appeals requested;

    2. The number of SNAP hearings held;

    3. The number of SNAP decisions overdue; and

    4. The number of SNAP appeals by type of disposition;

v. Submit and, upon court approval, implement a remedial plan to ensure the timely issuance of written decisions on SNAP appeals and prompt implementation of decisions in appellants' favor; and

vi. Submit, for the duration of any preliminary or permanent injunction, to monitoring by Plaintiffs' counsel or a third party monitor appointed by the Court, whose expenses will be borne by or recoverable from the State pursuant to 42 U.S.C. § 1988, in which random samples of SNAP appeals will

be provided on site or otherwise to the third party monitor to review for timeliness. Such monitoring should include review of random samples of SNAP appeals and such inspection of SNAP operations and Defendant's production of information as is reasonably required to assess the Defendant's compliance.

c) As to the Restoration of Lost Benefits Class, preliminarily and permanently enjoin Defendant to:

    i. Require Defendant to hold a fair hearing for anyone who submits an appeal after 90 days of an adverse action by Defendant but within 1 year; and

    ii. Submit, for the duration of any preliminary or permanent injunction, to monitoring by Plaintiffs' counsel or a third party monitor appointed by the Court, whose expenses will be borne by or recoverable from the State pursuant to 42 U.S.C. § 1988, a monthly report containing the list of SNAP applicants or enrollees whom DHS has denied fair hearings; and

d) Award Plaintiffs litigation costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

e) Grant such other, further, or different relief as this Court may deem just and proper.

Submitted on: January 9, 2025

**TENNESSEE JUSTICE CENTER**

Michele Johnson, TN BPR 16756
Gordon Bonnyman, Jr. TN BPR 2419
Brant Harrell, TN BPR 24470
TENNESSEE JUSTICE CENTER
155 Lafayette Street
Nashville, TN 37210
Phone: (615) 255-0331
Fax: (615) 255-0354
mjohnson@tnjustice.org
gbonnyman@tnjustice.org
bharrell@tnjustice.org

**DLA PIPER (US)**

Whitney C. Cloud,* DC Bar 187503
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Phone: (25) 656-3300
Email: whtney.cloud@us.dlapiper.com

Connor Rowinski,* NY Bar 6044036
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Phone: (212) 335-4500
Email: connor.rowinski@us.dlapiper.com

Allexanderia V. Bingham,* CA Bar 292672
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067-4735
Phone: (310) 595-3000
Email: allexanderia.bing-
ham@us.dlapiper.com

Respectfully submitted,

/s Brant Harrell

_____
        Brant Harrell

**HOGAN LOVELLS (US)**

E. Desmond Hogan,* DC Bar 458044
Jennifer Fleury,* DC Bar 187503
Melissa Giangrande Jacobs,* DC Bar 1735486
Fleming Farrell,* DC Bar 90004877
Katherine Valde,* DC Bar 90007448
Soojin Jeong,* DC Bar 90021021
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
desmond.hogan@hoganlovells.com
jennifer.fleury@hoganlovells.com
melissa.giangrande@hoganlovells.com
fleming.farrell@hoganlovells.com
katherine.valde@hoganlovells.com
soojin.jeong@hoganlovells.com

**MAZON**

Sarah Pratter,* CA Bar 318130
Director of Legal Advocacy
MAZON, Inc.
15303 Ventura Blvd, Ste 1100
Sherman Oaks, CA 91403-6621
Phone: (310) 442-0020
Facsimile: (310) 442-0030
spratter@mazon.org

*pro hac vice motions pending

79

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served via

original process consistent with the Federal Rules of Civil Procedure and this Court's Local Rules.


*/s/          Brant Harrell*
Brant Harrell
*On behalf of Counsel for Plaintiffs*