IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ERIN BULL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 3:25-cv-00041 |
| v. | ) | |
| | ) | JUDGE CAMPBELL |
| CLARENCE H. CARTER, | ) | MAGISTRATE JUDGE FRENSLEY |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is a Motion to Dismiss in Part filed by Defendant Clarence H. Carter, in his official capacity as Commissioner of the Tennessee Department of Human Services. (Doc. No. 75). Plaintiffs filed a Response in Opposition (Doc. No. 80) and Supplemental Response in Opposition (Doc. No. 84), and Defendant filed a Reply (Doc. No. 86). For the reasons discussed below, Defendant's Motion will be **GRANTED** in part and **DENIED** in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. SNAP Act

In 2008, Congress renamed a federally funded, state-administered food stamp program as the Supplemental Nutrition Assistance Program ("SNAP") pursuant to the Food and Nutrition Act of 2008 ("the SNAP Act."). (Doc. No. 1 ¶ 22).

The Food and Nutrition Service (FNS) of the United States Department of Agriculture (USDA) administers SNAP at the federal level. (*Id.* ¶ 23). States that elect to participate in SNAP determine eligibility for SNAP and distribute benefits to eligible participants. (*Id.*).

States are required to designate a state agency responsible for administering SNAP and complying with federal statutory and regulatory requirements. (*Id.* ¶ 24). The Tennessee

Department of Human Services ("DHS") is designated as Tennessee's state agency for the administration of SNAP. (*Id.* ¶ 26).

**B. Processing Requirements for Initial Applications**

The SNAP Act requires DHS to process applications for SNAP benefits within federally mandated timelines. (Doc. No. 1 ¶ 30). Generally, the SNAP application process includes filing and completing an application form, being interviewed, and having certain information verified. (*Id.*). SNAP eligibility is determined by "household," which is defined as "(A) an individual who lives alone or who, while living with others, customarily purchases food and prepares meals for home consumption separate and apart from the others; or (B) a group of individuals who live together and customarily purchase food and prepare meals together for home consumption." (*Id.* ¶ 31).

For most households, DHS is required to process applications and provide SNAP benefits to eligible applicants within 30 days after the initial application is filed. (*Id.* ¶ 32). DHS must schedule interviews "as promptly as possible to ensure eligible households receive an opportunity to participate within 30 days after the application is filed and is required to accommodate the needs of groups with special circumstances to the extent practicable." (*Id.* ¶ 33). DHS must also verify certain information from households and give households at least 10 days to provide a requested verification. (*Id.* ¶ 33).

Certain households qualify for expedited processing, including those with low income and liquid resources, those whose housing costs exceed the sum of their income and liquid resources, and certain migrant and seasonal-worker households. (*Id.* ¶ 35). DHS must affirmatively identify households eligible for expedited service at the time of application. (*Id.*).

2

SNAP benefits are distributed electronically each month and are based on household size and income. (*Id.* ¶¶ 37, 39). When DHS determines that a household is eligible, it must certify their eligibility for a minimum of six months and, for most households, no more than twelve months. (*Id.* ¶ 38). For households consisting of individuals who are over age 60 or who have a disability, the certification period is two years, subject to the agency's obligation to contact the household at least once in twelve months. (*Id.* ¶ 38). Upon a determination of eligibility, DHS arranges for its contractor to issue the household an electronic benefits transfer (EBT) card, similar to a debit card. (*Id.* ¶ 39). Each month, DHS loads the new monthly benefit onto the EBT card electronically, and in order for household members to access their SNAP benefits, they must have an activated EBT card and a personal identification number. (*Id.*). Individuals can use the EBT card to purchase food at authorized grocers and retailers. (*Id.*).

**C. Recertification Applications**

To continue receiving SNAP benefits, individuals must complete a recertification application. (*Id.* ¶ 44). DHS must provide a Notice of Expiration ("NOE") before the end of a household's certification period, which must include the date the certification period expires and the date by which the household must apply for recertification to receive uninterrupted benefits. (*Id.* ¶ 46). DHS must send the NOE before the start of the last month of the certification period, and if an eligible household submits its application no later than 15 days prior to the end of its existing certification period, DHS must provide the first allotment under the new certification no later than one month after the household received its last allotment under the prior certification. (*Id.* ¶ 47).

**D. Appeals Process**

DHS must provide "a fair hearing and a prompt determination thereafter to any household aggrieved by any action of the State agency." (*Id.* ¶ 49). DHS must hold a hearing and issue a written decision within 60 days of a request for a hearing. (*Id.*). If a household requests a postponement, which can be up to 30 days, DHS's deadline to provide a written decision extends by the length of the postponement. (*Id.*). If an appeal results in increased benefits, DHS must post the increase to an EBT card within 10 days of receipt of the written decision. (*Id.* ¶ 51).

Households whose benefits have not expired can request continuation of benefits during the pendency of an appeal. (*Id.* ¶ 52). If the appellant requests continuation of benefits and loses the appeal, DHS makes a claim against the appellant for any overissuance. (*Id.*).

**E. Restoration of Benefits**

Individuals who lose SNAP benefits may request restoration of benefits 90 days after the date of agency action. (Doc. No. 1 ¶ 53). DHS is also required to consider untimely requests for hearings as requests for restoration of lost benefits. (*Id.*). Generally, the time period for requesting a hearing is 90 days, but pursuant to 7 C.F.R. § 273.15(g), "[a]ction by the State agency shall include a denial of a request for restoration of benefits lost more than 90 days but less than a year prior to the request." (*Id.*).

Individuals can request correction of the underissuance of benefits and, if that request is denied or ignored, can then request a hearing on the denial or failure to act with reasonable timeliness. (*Id.* ¶ 54).

**F. Notice**

DHS is required to mail a notice of adverse action at least 10 days before an adverse action is taken. (*Id.* ¶ 55). DHS must "explain[] in easily understandable language: the proposed action;

4

the reason for the proposed action; and the household's right to request a fair hearing…" (*Id.* ¶ 56). DHS is also required at the initial certification and recertification to provide the household with a written and oral explanation of how simplified reporting works, a written and oral explanation of the reporting requirements including the additional changes that must be addressed in the periodic report and verified, the date the report is due, how to obtain assistance in the filing of the periodic report, and the consequences of failing to file a report. (*Id.* ¶ 58).

## G. This Action

Plaintiffs are individuals who are participating or have previously participated in SNAP and organizational Plaintiff The Contributor, Inc. ("The Contributor"). Plaintiffs filed a class action complaint "on behalf of themselves, and classes of similarly situated low-income Tennesseans" "to force the State to process SNAP applications and appeals accurately and on time, hold hearings for lost benefits, and provide adequate notices to participants, as required by federal law." (Doc. No. 1 ¶¶ 1, 5). Plaintiffs allege that DHS fails to determine eligibility for SNAP benefits reliably or timely and deprives affected households of access to timely hearings and appeal decisions through which they might obtain redress. Plaintiffs bring claims against Defendant for failure to timely process applications, timely issue fair hearing written decisions, provide adequate notices in violation of Plaintiffs' statutory due process, hold hearings to determine the restoration of lost benefits in violation of Plaintiffs' statutory due process, as well as for violation of Plaintiffs' constitutional due process. Plaintiffs seek declaratory judgment and injunctive relief.

Defendant moved to partially dismiss the Complaint for nonjoinder of parties, lack of subject matter jurisdiction, and failure to state a claim.

## II.     STANDARDS OF REVIEW

### A. Rule 21

"Rule 21 provides that the Court may at any time, on motion or on its own, add or drop a party." *Cunningham v. Rapid Cap. Funding, LLC/RCF*, No. 3:16-CV-2629, 2019 WL 5783670, at *1 (M.D. Tenn. Nov. 6, 2019).

### B. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Gentek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

While Defendant does not state whether his challenge to subject-matter jurisdiction is factual or facial, the Court finds that it is a facial challenge because it appears to attack the sufficiency of the Complaint. Defendant contends that Plaintiff The Contributor's alleged injuries are insufficient to establish organizational standing, the allegations in Counts 2 and 4 of the Complaint are insufficient to show that named Plaintiffs Kathryn Colbert and Trista Hubbard have

6

"sufficiently imminent and concrete" interests, and Plaintiff Candice Jacques' allegations demonstrate past injury that is unlikely to reoccur. (Doc. No. 76 at 11) (internal citation omitted).

Defendant also contends that the allegations in Counts 1, 3, and 5 of the Complaint "are missing a connection between the alleged violation and an injury to a current plaintiff," Plaintiffs' allegations underlying Count 1 in part, Count 2, and Count 4 are moot, and Plaintiffs request retrospective declaratory relief barred by sovereign immunity. (*Id.* at 12, 13, 26).

Accordingly, the Court will construe Defendant's attack on subject matter jurisdiction as a facial one and will consider only the sufficiency of the Complaint and "accept the allegations set forth in th[at] complaint as true." *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014).

## C. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id.* at 678. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Children's Servs.*, 679 F.3d 425, 429 (6th Cir. 2012).

7

# III. ANALYSIS

## A. Plaintiff Kathryn Colbert

Defendant first argues that Plaintiff Kathryn Colbert should be dismissed for lack of interest in participating in this action. Defendant contends that he noticed Colbert's deposition on February 28, 2025, Colbert failed to appear or explain her absence, and Colbert did not attempt to reschedule it. Defendant also contends that Colbert has failed to participate in this lawsuit since her deposition was scheduled.

In response, counsel for Plaintiffs state that they have made several unsuccessful attempts to communicate with Plaintiff Colbert regarding continuing the litigation. Counsel for Plaintiffs also state that they "cannot ethically terminate her claim," and that it is within the Court's discretion to assess Colbert's continued role in this action. (Doc. No. 80 at 9).

Due to Colbert's continued failure to participate in this action and Plaintiffs' counsel's unsuccessful attempts to communicate with Colbert regarding her intention to pursue her claims in this action, dismissal is appropriate. Accordingly, Plaintiff Colbert's claims are dismissed without prejudice.

## B. Article III Standing

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have Article III standing, a plaintiff must allege "(1) an injury in fact (2) that's traceable to the defendant's conduct and (3) that the courts can redress." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) (citing *Lujan*, 504 U.S. at 559-61). "Courts often must apply [the] three-part standing test when plaintiffs request an injunction against the enforcement of a law or regulation. To seek that 'forward-looking relief,'

plaintiffs must first show that they will likely suffer an injury from the challenged conduct… only 'concrete' and 'particularized' injuries—such as economic or physical harms—will suffice." *Tenn. Conference of the NAACP v. Lee*, No. 24-5546, 2025 U.S. App. LEXIS 13814, at *11 (6th Cir. June 5, 2025) (internal citations omitted). Moreover, "[b]ecause an injunction seeks to stop future harms from occurring, plaintiffs also must show that this type of cognizable injury is 'imminent,' which requires them to establish that it is '*certainly impending*.'" *Id.* (internal citations omitted) (emphasis in original). "A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769, 171 L. Ed. 2d 737 (2008).

Standing is assessed under the facts existing when the complaint is filed. *See Am. C.L. Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 645 (6th Cir. 2004); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769, 171 L. Ed. 2d 737 (2008) (internal citation omitted) ("While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."). Moreover, "[t]he standing inquiry is not a merits inquiry." *Gerber*, 14 F.4th at 505 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). Through the pending motion, Defendant challenges standing as to all Plaintiffs except Plaintiff Candice Pegues' claim in Count 1 of the Complaint that Defendant does not provide EBT cards to standard applicants within 30 days.

### 1. Individual Plaintiffs (Counts 1-5)

An injury capable of supporting Article III standing requires the invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical. *See CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021) (citing *Spokeo,*

*Inc. v. Robins*, 578 U.S. 330, 339 (2016)). To allege the invasion of a legally protected interest, "requires only that the plaintiff have a 'right to relief if the court accepts' the plaintiff's legal position about the meaning of a constitutional provision or a statute." *Gerber*, 14 F.4th at 507 (quoting *CHKRS*, 984 F.3d at 488).

Here, the Complaint alleges that DHS's failure to administer SNAP in compliance with federal law harms individuals by (1) failing to timely process initial and recertification SNAP applications which results in a systemic failure to provide an opportunity to participate in SNAP; (2) failing to provide timely written appeals decisions; (3) failing to provide accurate notices for DHS's adverse actions; (4) failing to provide fair hearings to individuals who have filed requests for lost benefits; and (5) that in doing so, Defendant has deprived Plaintiffs of due process of law. (Doc. No. 1 ¶¶ 372-373, 376, 383, 387). These pleaded injuries to constitutional rights are sufficient for the individual Plaintiffs' claims in Counts 1-5. *See Wright v. O'Day*, 706 F.3d 769, 771–72 (6th Cir. 2013).

"As to traceability, a defendant's actions must have a 'causal connection' to the plaintiff's injury." *Gerber*, 14 F.4th at 505 (citing *Lujan*, 504 U.S. at 560). Notably, the Sixth Circuit has recognized that "[w]hile there must exist a causal connection between the plaintiff's injury and the defendant's conduct, traceability is not the same thing as proximate causation," "[t]he standard for establishing traceability for standing purposes is *less demanding* than the standard for proving tort causation," and "[a]t the pleading stage, the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest." *In re AME Church Employee Ret. Fund Litig.*, No. 122MD03035STAJAY, 2024 WL 844943, at *7 (W.D. Tenn. Feb. 28, 2024) (internal citations omitted).

10

Here, the Complaint alleges that Defendant caused Plaintiffs' injuries by creating a substantial risk of erroneous deprivation of SNAP benefits, failing to provide adequate pre-deprivation notice, an opportunity for a fair hearing, an opportunity for a fair hearing at a meaningful time, timely corrective action, and subjecting otherwise eligible individuals to arbitrary denials of benefits and fair access to SNAP benefits. (Doc. No. 1 ¶ 387). These allegations satisfy the "relatively modest" burden of demonstrating Article III causation at this stage of litigation. *In re AME Church Employee Ret. Fund Litig.*, 2024 WL 844943, at *7 (internal citations omitted).

"As to redressability, it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Gerber*, 14 F.4th at 505 (quoting *Lujan*, 504 U.S. at 561). If the Court determines Defendant is violating his obligations under the SNAP Act and requires Defendant to comply with his obligations under federal law for administering SNAP, then the harms that allegedly flow from the current system will be prevented, and thus Plaintiffs' claimed injuries redressed.

Defendant's merit-based arguments concerning the individual Plaintiffs' injuries in fact are not persuasive. *See CHKRS*, 984 F.3d at 488-89 (reversing district court that granted motion to dismiss for lack of standing for failure to allege a legally protectable interest because the trial court relied on merit-based precedent rather than cases articulating the requirements for Article III standing).

Defendant also appears to argue that Plaintiffs are without standing to assert their claims because the named Plaintiffs' applications, appeals, and requests for restoration of lost benefits have been processed since this lawsuit was filed. (Doc. No. 76 at 11-13). However, construing the allegations in the Complaint as true, Plaintiffs have sufficiently alleged that Defendant failed to timely process Plaintiffs' SNAP applications, appeals, and requests for restoration of lost benefits

as of the time the Complaint was filed. Moreover, the record Defendant relies upon to show a policy change regarding untimely hearing requests looks to events after this lawsuit was filed.[1] (Doc. No. 40-3 at PageID # 2537 – 2539).

Accordingly, the Court finds that the individual Plaintiffs' allegations in the Complaint satisfy the injury in fact requirement and Defendant's standing argument fails. *Barry v. Corrigan*, 79 F. Supp. 3d 712, 723 (E.D. Mich. 2015), *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016) ("Defendant maintains Barry lacks standing because he has suffered no injury in fact… Defendant apparently means that because Barry has received food assistance 'every month since June 1, 2013,' he has suffered no injury... But defendant fails to counter evidence that (1) Barry's food assistance had been withheld at the time he filed the complaint, (2) Barry's disqualification had not been resolved at the time he filed the complaint, leaving him exposed to the possibility of having to repay benefits and to termination of future benefits, and (3) Barry suffered a procedural injury from defendant's notice.").

## 2. Plaintiff The Contributor (Counts 1-3 and Count 5)

The Contributor claims organizational injuries to sue on its own behalf. Defendant contends that The Contributor lacks organizational standing and must be dismissed.

The Sixth Circuit has recognized that "[w]hen a law regulates a plaintiff (which must alter its conduct), [the causation] showing does not pose much difficulty" but "[s]ometimes…a plaintiff seeks to enjoin a law that regulates '*someone else*' because the plaintiff believes that the law will indirectly affect it too." *Tenn. Conference of the NAACP*, 2025 U.S. App. LEXIS 13814, at *7-8 (emphasis in original) (internal citations omitted). When that occurs, "[s]uch an unregulated party

---

[1]     Much of Defendant's argument relies on information found outside the pleadings. While Defendant's arguments may fare better under a summary judgment standard, at this juncture the Court must consider only the allegations in the Complaint.

must show more to sue because it must trace its injuries to the enforcement of the law (rather than the decisions of third parties not before the court)." *Id.* (internal citations omitted).

Perceptible impairment to "the organization's activities" or a "drain on the organization's resources" qualify as concrete and demonstrable injuries for standing purposes. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013). However, the Sixth Circuit has recognized that "the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing" because "[i]t is not enough to broadly gesture toward 'a drain on an organization's resources' and call it a day." *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025) (internal citations omitted). Instead, "[t]here must be something more—the court must find that the organization has alleged and shown that the conduct challenged in the suit interfered with the organization's 'core business activities.'" *Id.* (internal citation omitted).

One of The Contributor's alleged core activities is publishing a newspaper and selling it to unhoused individuals who work as newspaper vendors. (Doc. No. 1 ¶ 59). The Contributor alleges that selling the newspaper furthers its mission of empowering individuals experiencing poverty "to achieve income, dignity, housing, and community" as unhoused vendors "learn how to sell the papers to the public, keep the money they earn, and then buy more newspapers from The Contributor." (Doc. No. 1 ¶ 59). The Contributor alleges that it furthers its mission by helping provide and maintain vendors' access to social services, including SNAP benefits and that "revenues from the sale of newspapers to its vendors, and the vendors' sale of the newspaper to the public, are vital to The Contributor's economic sustainability, and to its ability to fulfill its mission." (Doc. No. 1 ¶¶ 60,61).

13

The Contributor also alleges that DHS's purported violations "have the effect of taking vendors' time and efforts away from selling The Contributor's newspapers and increasing the amount of time, money, and resources necessary for The Contributor to try to address those problems on behalf of vendors" and "results in vendors purchasing fewer newspapers from The Contributor for resale, thereby reducing the organization's revenues, and preventing The Contributor from being able to commit more of its limited internal resources to other measures to combat homelessness." (Doc. No. 1 ¶ 68). At the motion to dismiss stage, these allegations are sufficient to establish injury in fact for Counts 1-3 and 5.[2]

The Contributor's alleged injuries underlying Counts 1-3 and 5 are traceable to Defendant's conduct. The Complaint alleges that "[d]ue to Defendant's violations of law complained of herein, the SNAP eligibility and appeals process as it is administered by DHS is almost impossible for most of The Contributor's vendors to successfully navigate without help" and it is "necessary to devote significant resources to helping vendors overcome DHS barriers to SNAP participation and full access, in order to prevent the improper denial or loss of SNAP benefits from interfering with the vendors' ability to sell newspapers and achieve and maintain stable housing" and "[w]ere it not for the barriers to SNAP participation resulting from DHS's administration of the SNAP program, complained of herein, The Contributor would be able to commit more resources to enabling more unhoused Nashvillians to obtain and maintain stable housing." (Doc. No. 1 ¶¶ 63, 67). The Complaint also alleges that "[t]he Contributor has found it necessary to maintain [the SNAP Coordinator] position in order to mitigate the harm to its vendors and its own business revenues that results from Defendant's unlawful administration of

---

[2]     The Contributor's claims benefit from the standard of review applicable at this juncture. While the Court accepts as true The Contributor's allegations, as it must, it appears those allegations are only barely traceable to Defendant's alleged conduct. A review of the facts at some future time and under a different standard may very well demand a different result for The Contributor's claims.

14

Tennessee's SNAP program." (*Id.* ¶¶ 63-64). Accordingly, The Contributor has sufficiently pleaded facts showing that its alleged injuries are casually connected to Defendant's purported violations of the SNAP Act.

The Contributor has also established that a favorable decision would redress its alleged injuries because it seeks an injunction that requires Defendant to comply with its obligations under the SNAP Act and if Plaintiffs are awarded the requested relief, then the harms that allegedly flow from DHS' administration of SNAP, including The Contributor's economic harm, would be redressed. (Doc. No. 1 ¶ 68).

Defendant contends that The Contributor's funding the SNAP Coordinator position is a "diversion of resources in response to a defendant's actions" that fails to create standing. (Doc. No. 76 at 8). Defendant also contends that The Contributor's alleged reduction in sales fails to show a direct restraint on its core business activities and that the alleged connection between newspaper sales revenue and DHS's administration of SNAP is tenuous.

The Sixth Circuit recently addressed the diversion-of-resources theory in *Tenn. Conference of the NAACP v. Lee*, No. 24-5546, 2025 U.S. App. LEXIS 13814, at *1 (6th Cir. 2025). In that case, the Court recognized that organizational plaintiffs were historically permitted to sue a defendant over the defendant's conduct if the organization "voluntarily spent 'resources' to challenge that action." *Id.* at *6 (internal citation omitted). However, the diversion-of-resources theory was disavowed in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 393, 144 S. Ct. 1540, 1562 (2024). In *Tenn. Conference of the NAACP*, the Sixth Circuit called attention to the reasoning in *Alliance* that "a plaintiff could not establish standing merely by spending 'money to gather information and advocate against the defendant's action.'" *Id.* at *9 (internal citation omitted).

15

The Sixth Circuit acknowledged that *Alliance*'s rational was "somewhat unclear" and identified certain lingering questions, including which of the three elements of standing the plaintiffs had failed to meet. *Id.* Ultimately, the Court held that "organizations can sometimes have standing to challenge a government action that does not regulate them if the action causes them to suffer economic harms" but that "organizations cannot 'spend [their] way into standing' by voluntarily using resources to counter the government action." *Id.* at *10 (internal citations omitted). However, the Court noted that *Alliance* "left unclear the line that divides spending that satisfies Article III from spending that does not" and that "standing's causation element can pose 'line-drawing difficulties' that often depend on a case's specific facts." *Id.* at *10-11 (internal citation omitted).

Against this backdrop, the Court finds that The Contributor has sufficiently pled facts showing economic harm rather than a merely voluntary diversion of resources to oppose Defendant's administration of SNAP. Defendant acknowledges that The Contributor created the SNAP Coordinator position in February 2022, which was one year before the purported 2023 and 2024 SNAP administration delays that are at issue in this lawsuit. (Doc. No. 76 at 9). Moreover, The Contributor has alleged that DHS's SNAP administration has effectively taken vendors' time and efforts away from selling newspapers, which has resulted in decreased newspaper sales and resulted in The Contributor expending more resources to assist its vendors in accessing SNAP. (Doc. No. 1 ¶ 68). Accordingly, Defendant's challenges to The Contributor's standing are without merit.

**C. Mootness**

Defendant also contends that the claims underlying Count 1 in part and Counts 2 and 4 are moot and should be dismissed.

16

Mootness addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit, so that the case-or-controversy requirement in Article III for federal jurisdiction is not satisfied. *Moore v. Harper*, 600 U.S. 1, 14 (2023); *Kentucky v. Yellen*, 54 F.4th 325, 340 (6th Cir. 2022) ("Whether an 'intervening circumstance' arising after a suit has been filed causes a plaintiff's asserted injury to dissipate is really a question of mootness."). The standard "for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted); *Fed. Bureau of Investigation v. Fikre*, 144 S. Ct. 771 (2024) (same). The "heavy burden" of persuading the court that the challenged conduct cannot reasonably be expected to resume lies with the party asserting mootness. *See id.* However, because it is the government that has voluntarily ceased its allegedly illegal conduct, the burden of showing of mootness is lower. *See Doe v. Univ. of Michigan*, 78 F.4th 929, 946 (6th Cir. 2023) (citing *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019)).

When considering Defendant's assertion that the case is moot, the Court takes into account the totality of circumstances surrounding voluntary cessation. *Univ. of Michigan*, 78 F.4th at 946 (6th Cir. 2023) (citing *Speech First*, 939 F.3d at 767–68). Although courts treat cessation of the allegedly illegal conduct by government officials with more solicitude than similar action by private parties, not all government action "enjoys the same degree of solicitude[.]" *Id.* Accordingly, courts consider "the manner in which the cessation was executed" as part of the totality-of-the-circumstances analysis. *Id.*

Government action in the form of the passage of new legislation or the repeal of challenged legislation enjoys the most solicitude; this type of government action "presumptively moot[s] the case unless there are clear contraindications that the change is not genuine." *Id.* When regulatory changes are implemented with "legislative-like procedures" or "formal processes," the government "need not do much more than simply represent that it would not return to the challenged policies." *Id.* On the other hand, when government action brings about change that is "ad hoc, discretionary, and easily reversible" or "if the discretion to effect the change lies with one agency or individual," "significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Thomas v. City of Memphis, Tennessee*, 996 F.3d 318, 324 (6th Cir. 2021).

Additionally, courts should give the government "the same amount of solicitude when it makes a change to comply with binding precedent (even if it has done so in an ad hoc manner) as the courts give the government when it makes a change with legislative-like procedures[.]" *Univ. of Michigan*, 78 F.4th at 947–48 (citing *Thompson v. Whitmer*, No. 21-2602, 2022 WL 168395, at *4 (6th Cir. Jan. 19, 2022) (litigation was moot when state supreme court declared challenged actions illegal and therefore, for the behavior to recur, the government would have to disregard the Michigan Supreme Court's interpretation of state law, which a court would not reasonably expect); *Midwest Inst. of Health, PLLC v. Whitmer*, Nos. 20-1611/1650, 2022 WL 304954, at *2 (6th Cir. Feb. 2, 2022) (same); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 843 F. App'x 707, 709–10 (6th Cir. 2021) (same)). Accordingly, "[w]hen the government has made a regulatory change in order to comply with binding precedent, the government need only represent that it does not intend to return to the previous policy." *Univ. of Michigan*, 78 F.4th at 948.

Defendant argues that Plaintiffs' claims regarding alleged untimely processing of initial and recertification applications in Count 1 are moot because "DHS is now timely processing initial

18

applications for thirty-day applicants and recertification applications." (Doc. No. 76 at 16). Similarly, Defendant contends that Plaintiffs' claims that DHS failed to schedule interviews timely and work with individuals to schedule interviews at times convenient to them are moot because "[o]n March 12, 2025, DHS implemented a system change that allows online applicants to schedule interviews at a time convenient to them." (*Id.* at 17). Defendant also argues that the claims in Count 2 are moot because DHS has resolved all appeals for Plaintiffs Bull, Desjardin, Gugliemelli, Maddox, and Ominyi that were pending at the time this lawsuit was filed. Defendant argues that DHS began modifying its practices regarding appeals in May 2024 which it "recently formalized." (Doc. No. 76 at 20). Defendant argues that DHS has taken steps to assist with streamlining and processing appeals, including implementing an Appeal Volume Management Plan and increasing the number of appeals dockets available. Defendant argues that as a result of these changes, DHS will be able to protect against future backlogs in the event of increased appeals volume. Defendant also argues that the claims underlying Count 4 are moot because Defendant made a recent policy change to construe untimely fair hearing requests as requests for restoration of SNAP benefits if they are filed more than 90 days but less than 1 year after an adverse action occurred, as required by the SNAP Act. Defendant does not dispute that DHS failed to comply with this requirement prior to its policy change, which was enacted after this lawsuit was filed. Defendant also argues that DHS used a "quasi-legislative process" when formalizing the policy changes and involved a "multi-stage process that required 16 meetings between three divisions of DHS and approval by five high-ranking agency officials with final signature by Commissioner Carter" and that "[r]eversing these actions would be enormously burdensome on DHS" and "DHS has no intention of reverting to the practices that were in place before they began implementing these changes." (Doc. No. 76 at 22).

19

The timing of Defendant's formal policy changes raises questions about the genuineness of the cessation. Here, Defendant changed DHS's relevant policies after the complaint was filed. "If anything, this increases the [government]'s burden to prove that its change is genuine." *Speech First*, 939 F.3d at 769. Moreover, Defendant has not demonstrated that all putative class members have had their applications, appeals, and restoration of lost benefits processed. *Banas v. Dempsey*, 742 F.2d 277, 283 (6th Cir. 1984), *aff'd sub nom. Green v. Mansour*, 474 U.S. 64, 106 S. Ct. 423, 88 L. Ed. 2d 371 (1985) ("The record, however, seems clear that not all members of the putative class…did in fact receive all the benefits lost as a result of defendant's conduct allegedly in violation of federal law…To the extent that there remained putative class members who allegedly had lost benefits and had not yet been reimbursed, the *Banas* case could not have been considered moot, even though the named plaintiffs themselves no longer had a personal stake in the receipt of any lost benefits."). Nor has Defendant demonstrated that its policy changes "have completely and irrevocably eradicated the effects of the alleged violation." *Thomas v. City of Memphis, Tennessee*, 996 F.3d 318, 329 (6th Cir. 2021). Accordingly, Defendant has failed to demonstrate that Plaintiffs' claims are moot.

Defendant next argues that the transitory exception to the mootness doctrine does not apply due to the permanent nature of its policy changes.

The Sixth Circuit recently addressed the inherently transitory exception. In *Patton v. Fitzhugh*, 131 F.4th 383 (6th Cir. 2025), the Sixth Circuit held that for the inherently transitory exception to apply "(1) [] the injury [must be] so transitory that it would likely evade review by becoming moot before the district court can rule on class certification, and (2) [] it is certain other class members are suffering the injury." *Id.* at 394. The Sixth Circuit also recognized that "[i]n a class action that falls into the inherently transitory exception, a member of the class reasonably

20

will be subjected to the same challenged action" and "[t]hat a member of the class will be subjected to the same challenged action guarantees the 'capable of repetition' portion of the traditional doctrine" because "[e]ven as the named-plaintiff's claim becomes moot—as is the nature with 'inherently transitory' claims—the challenged action is nevertheless capable of repetition through a member of the class…Instead of the named-plaintiff's injuries ensuring repetition, the putative class fills the gap." *Id.* at 394. Accordingly, "[e]ven if the named plaintiff has no continuing interest in their claim on the merits, they still have an interest in the claims of the class that they are entitled to represent" which "is effectively a strain of the capable-of-repetition-yet-evading-review doctrine: a class-action plaintiff has an 'inherently transitory' claim that evades review, and the challenged action is capable of repetition because there is a durable class that continues to suffer from the same harm." *Id.* at 396. The Sixth Circuit further explained that even in cases where a plaintiff's claims were forfeited, the Court would "hear such arguments 'in exceptional cases or particular circumstances, or when the rule would produce a plain miscarriage of justice.'" *Id.* (internal citations omitted). Such an exception is "most commonly applied where the issue is one of law, and further development of the record is unnecessary." *Id.* (internal citations omitted). The Court in *Patton* ultimately held that the inherently transitory exception applied to the plaintiff's claims and noted that "the filing of a class-action complaint can serve as the prerequisite for arguing the 'inherently transitory' exception for class-action claims." *Id.* at 398.

In the present case, Plaintiffs filed a class action Complaint. Defendant argues that Plaintiffs' claims fail to satisfy the second element of the inherently transitory exception because "DHS has demonstrated all-encompassing changes to its appeals processes that are now bearing fruit" and "upon learning that DHS needed to change its treatment of untimely appeals, DHS immediately developed, enacted, and implemented a policy to do just that" and "[t]here is no

21

certainty or clarity that the challenged conduct will reoccur." (Doc. No. 76 at 25). This position misstates Defendant's burden. Whether or not uncertainty exists regarding reoccurrence of the challenged conduct does not resolve the issue of mootness. Instead, Defendant must show that "it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Doe v. Univ. of Michigan*, 78 F.4th 929, 946 (6th Cir. 2023). Here, Defendant fails to establish that its challenged conduct could not reasonably be expected to reoccur or that DHS will not change its policies again. *See Speech First*, 939 F.3d at 769. "[S]olicitude toward the government's cessation alone is insufficient to establish that the case is moot." *Univ. of Michigan*, 78 F.4th at 947; *see also League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474 (6th Cir. 2008) ("In their brief, the Secretary and Governor focused on the passage of H.B. 3 to support their argument that the claims presented are moot. At oral argument, they pointed to several recent directives issued by the Secretary for further support. Both arguments miss the mark. Presumably, it was never the law or official policy of the State of Ohio to deny Ohioans access to the franchise. Rather, the constitutional violations alleged stem from the Secretary's and Governor's failure to prevent and correct the system-wide chaos that is alleged to have occurred in November 2004, and perhaps as far back as 1971. It is hard to see how the voluntary passage of legislation or issuance of directives can moot claims such as these."); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated.").

Here, the nature of Plaintiffs' claims are inherently transitory and the "filing of a class-action complaint is enough to save the claims from being mooted." *Patton*, 131 F.4th at 396. Accordingly, even if Plaintiffs' underlying claims were moot, which for the reasons stated above

they are not, the inherently transitory exception to the mootness doctrine applies to Plaintiffs'
claims.

**D. Sovereign Immunity**

Defendant also contends that Plaintiffs seek retroactive declaratory relief that is barred by
sovereign immunity by requesting declarations that Defendant previously violated federal
requirements. (Doc. No. 76 at 26).

"Sovereign immunity's bar to suits for damages in federal courts also includes suits for
retroactive injunctive relief…Relief is retrospective, and therefore barred by sovereign immunity,
if 'it is tantamount to an award of damages for a past violation of federal law.'" *Van Morgan v.
Barker*, No. 3:19-CV-122, 2020 WL 265282, at *3 (E.D. Tenn. Jan. 17, 2020) (internal citations
omitted). However, "[u]nder the *Ex parte Young* exception, a federal court can issue prospective
injunctive and declaratory relief compelling a state official to comply with federal law, regardless
of whether compliance might have an ancillary effect on the state treasury…'[i]t is beyond dispute
that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal
rights.'" *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507–08 (6th Cir. 2008). "The *Ex parte Young*
exception does not, however, extend to any retroactive relief." *Id.* (internal citation omitted).

"To determine if *Ex parte Young* applies, a court 'need only conduct a 'straightforward
inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief
properly characterized as prospective.'" *Universal Life Church Monastery Storehouse v. Nabors*,
508 F. Supp. 3d 221, 236–37 (M.D. Tenn. 2020) (quoting *Boler*, 865 F.3d at 412) (quoting *Verizon
Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). Whether the state official's
challenged action is actually inconsistent with federal law is not part of the inquiry into whether
suit lies under *Ex parte Young*. *See Verizon*, 535 U.S. at 646 (rejecting suggestion that *Ex parte*

*Young* did not apply because the order at issue was not inconsistent with federal law and stating that "the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."). The only relevant inquiry under *Ex parte Young* is whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *See id.* at 636.

Here, the Complaint challenges Defendant's policies and practices of processing SNAP applications, issuing decisions on appeals, and providing hearings for restoration of lost benefits. The Complaint alleges ongoing violations of the SNAP Act and asks the Court to enjoin Defendant from violating federal law. (Doc. No. 1 ¶¶ 285, 297, 305, 338, 387). This is sufficient to satisfy the inquiry. *See Verizon*, 535 U.S. at 645. Accordingly, the Court finds that the *Ex Parte Young* exception applies to Plaintiffs' injunctive relief claims and that they are not barred by the Eleventh Amendment.

**E. Merits**

    1. <u>Allegations About SNAP Interviews</u>

 Defendant contends that Plaintiffs' claims regarding SNAP interviews fail to state a claim upon which relief may be granted and should be dismissed. Defendant specifically contests Plaintiffs' allegations that DHS cannot deny eligibility to an applicant for the applicant's refusal to cooperate without finding that a missed interview was the result of the individual's refusal, rather than mere failure, to cooperate, that DHS "makes it impossible for applicants to complete the interview process by failing to provide sufficient advance notice of the interview, then uses that failure to deny benefits for 'refusal to cooperate' with the agency in determining their eligibility," that "DHS unilaterally schedules interviews and purports to mail advance notice to applicants informing them when to expect a call for their telephone interview," that "DHS

terminates individuals for failing to participate in an interview when DHS staff did not make the interview calls at all, provide any advanced Notice of Appointment or Interview, give sufficient advanced notice of an interview to reasonably enable an applicant to attend the scheduled appointment, or determine whether the individual was actually refusing to cooperate or merely missed the appointment," and that "DHS routinely terminates or denies individuals without assessing whether a missed interview is the result of a household's *refusal* to comply or mere failure to comply." (Doc. No. 1 ¶¶ 34, 277-78, 293).

Defendant moves to dismiss under Rule 12(b)(6) on the grounds that Section 1983 grants relief only for deprivation of rights secured by federal laws and that the allegations do not demonstrate a violation of federal regulations. Defendant argues that federal regulations require that DHS deny applications for an applicant's failure to complete an interview if an applicant does not contact DHS within the 30 day application processing period after missing an interview. Plaintiffs contend that their claims regarding DHS's interview practices are fact based and that Defendant "asks this Court to credit its assertions that it only denies benefits to those individuals who refuse to cooperate by missing their interview." (Doc. No. 80 at 20). Plaintiffs also contend that DHS's interview practices are "inherently factual inquiries ill-suited for dismissal." (*Id.*). The Court agrees and finds that DHS's interview practices involve factual determinations that the Court cannot construe in Defendant's favor at this stage. Accordingly, Defendant's motion will not be granted on this ground.

2. <u>Allegations About Continuation of Benefits</u>

Defendant next contests Plaintiffs' request that DHS be required to permit "all appellants to 'opt-out' of continuation of benefits during the remainder of the certification period…rather than requiring them to 'opt-in' in order to receive continuation of benefits." (Doc. No. 76 at 27)

(internal citations omitted). Defendant argues that the request is overly broad because individual appellants who are not receiving benefits cannot qualify for continuation of their benefits and appellants who receive benefits only qualify for automatic continuation if they request a fair hearing within the 10-day adverse notice period provided in the notice of adverse action.

Defendant also seeks dismissal of Plaintiffs' allegation that "DHS discourages individuals from applying for continuation of benefits by requiring appellants to 'opt-in' to receive continuation of benefits, when DHS is actually required to allow appellants to 'opt-out' of continuation of benefits." (Doc. No. 76 at 27) (internal citations omitted). Defendant contends that Plaintiffs' allegation is "untethered to legal requirements" and that DHS complies with federal regulations because the form for requesting a fair hearing includes a space for the household to indicate whether continued benefits are requested. (Doc. No. 76 at 28).

Accordingly, Defendant asks the Court to construe these factual allegations in their favor rather than Plaintiffs. Such would be inappropriate at the motion to dismiss stage. Accordingly, Defendant's motion will not be granted on this ground.

3. Allegations About DHS's Notices (Count 3)

Defendant argues that Plaintiffs' allegations regarding the adequacy of DHS's notices fail to state a claim. Specifically, Defendant contends that Plaintiffs do not specify which notices are "not understandable, or why." (Doc. No. 76 at 28). Defendant also challenges Plaintiffs' request for DHS to send a notice of delay that states that DHS's untimely application processing violates federal law, that the applicant can file a delayed application appeal, and that the applicant may have additional remedies and may consult an attorney for more information regarding remedies because Defendant contends that federal regulations only require "a notice of undue delay to state

that applications are 'being held pending' and that DHS still needs to take certain actions to complete the review." (Doc. No. 76 at 29).

Defendant also challenges Plaintiffs' request that DHS be required to amend its right to appeal notice to state that appellants have a right to a written decision within 60 days of filing, but that "federal regulation only requires that DHS notify applicants of their right to a hearing, how they can ask for one, and that they can have representation at the hearing." (Doc. No. 76 at 29). Defendant contends that its right to appeal notice complies with federal regulation requirements.

Finally, Defendant challenges Plaintiffs' request for DHS to be required to send a notice of delay to all appellants whose appeals last over 60 days as Defendant contends that this remedy is not required by federal regulation.

Notably, Defendant concedes that "analyzing the adequacy of a notice is a fact-intensive, context specific task." (Doc. No. 76 at 29). The Court agrees and finds that allegations regarding DHS's notices involve factual determinations that are inappropriate to construe in Defendant's favor at the motion to dismiss stage.

4. Allegations About Restoration of Benefits (Count 4)

Defendant next argues that Plaintiffs' allegations regarding restoration of benefits in Count 4 fail to state a claim because DHS "is not required to give [] SNAP recipients a fair hearing simply because they submitted an untimely request for restoration of lost benefits" and "[r]ather, the recipients may request a fair hearing *after* DHS denies a request for a restoration of lost benefits." (Doc. No. 76 at 30).

DHS's practices regarding restoration of lost benefits involve factual determinations that are inappropriate to construe in Defendant's favor at the motion to dismiss stage. Accordingly, Defendant's motion will not be granted on this ground.

27

5. Allegations About Procedural Due Process (Count 5)

"In general, procedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests." *Schulkers v. Kammer*, 955 F.3d 520, 545 (6th Cir. 2020) (citation and internal quotations omitted). "To establish a procedural due process violation, Plaintiffs must show (1) that they have been deprived of a cognizable liberty interest, and (2) that such deprivation occurred without adequate procedural protections." *Id.* Defendant contends that Plaintiffs have failed to show that DHS's SNAP processes are insufficient or how DHS's purported violations prejudice the outcome of Plaintiffs' applications and appeals. Specifically, Defendant contends that Plaintiffs request that DHS be required to include in the right-to-appeal notice that an appellant has a right to a written decision within 60 days of filing, and that "the absence of this statement does not reduce a risk of erroneous deprivation of benefits." (Doc. No. 76 at 31). Defendant also contends that "federal guidance documents dispute the value of" Plaintiffs' request for DHS to notify appellants whose appeals have been pending for 60 days that DHS is in violation of their right to a timely decision. (Doc. No. 76 at 32). Finally, Defendant challenges Plaintiffs' request that DHS permit appellants to opt out of continuation of benefits because it "violates federal regulations." (Doc. No. 76 at 32). Defendant contends that Plaintiffs' requests fall outside the scope of federal regulations and "ignore that the burden of making such changes would impose on DHS." (Doc. No. 76 at 33). Defendant also argues that Plaintiffs have not demonstrated that their applications or appeals would have a different outcome if DHS implemented changes demanded by Plaintiffs.

The Court finds that Plaintiffs' due process allegations involve factual determinations which are improper to construe in Defendant's favor at the motion to dismiss stage. Accordingly, Defendant's motion will be denied as to Plaintiffs' procedural due process claims.

28

### IV. CONCLUSION

For the reasons stated, Defendant's partial motion to dismiss (Doc. No. 75) is **GRANTED** in part and **DENIED** in part. Defendant's request to dismiss Plaintiff Kathryn Colbert is **GRANTED**. Defendant's motion to dismiss Plaintiffs' claims is **DENIED**.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE